NORTHERN VIRGINIA VAN
COMPANY INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 489–83C.

United States Claims Court.

Sept. 1, 1983.

Steven P. Pitler, Washington, D.C., for plaintiff; Shaw, Pittman, Potts & Trowbridge, Washington, D.C., of counsel.

Thomas W.B. Porter, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

WIESE, Judge:

In a preliminary injunction issued by this court on August 3, 1983, defendant, acting through the General Services Administration, was ordered to refrain from making any award for moving services under Solicitation No. WFC–E3–R–1056 ("1056") "to any other contractor save the plaintiff * * for the period during which this order remains in effect." This action by the court was based upon, among other reasons, an assessment that the contracting officer's intended rejection of plaintiff's low bid was neither contractually permissible nor rationally based.

Once the injunction had issued, a new dimension was added to the controversy when the Government determined on August 9, 1983, to cancel the enjoined solicitation (No. 1056) and to procure the same services through a new solicitation—Solicitation No. WFC–E3–R–1091 ("1091"). Reacting to this anticipated action, plaintiff sought leave on August 15, 1983 to file a supplemental complaint (since allowed) asking the court to declare the proposed cancellation and resolicitation (and any resulting award) improper and illegal, to enjoin the same, and also to order reinstatement of Solicitation No. 1056.

Both aspects of the controversy were addressed in supplementary trial proceedings undertaken in connection with a hearing for permanent injunction held August 19, 1983. By bench opinion announced at the conclusion of those proceedings, the court, then having considered the entire evidentiary record and guided by the oral arguments of counsel and the briefs submitted therewith, upheld the legality of the Government's proposed cancellation and resolicitation. This opinion is given to set the case and its result in more ordered perspective.

### Facts

On May 17, 1983, the General Services Administration ("GSA") issued a solicitation (No. 1056) seeking bids on an estimated $750,000 "requirements type" contract covering transportation and related moving services to be performed for the Department of the Navy within the Washington, D.C. area during the year beginning July 1, 1983.

Among the solicitation's documents was a bid schedule which listed four categories or items of anticipated contract services ("Vehicle w/Driver"; "Vehicle w/Driver and one Laborer/Helper"; "Laborer/Helper"; "Crew Leader (Foreman)"), together with an estimate of the average number of personnel that would be required for each such line item during regular hours and on an overtime basis. Bidders were obliged to enter a rate per hour for each of the line items and were further specifically cautioned (in an amendment to the solicitation) that "PRICES MUST BE QUOTED ON EACH ITEM IN THE BID SCHEDULE TO BE CONSIDERED FOR AWARD, (i.e. '0', 'No Charge', 'N/C' and 'N/A' will be considered non-responsive)."

As to the method of award, the solicitation stated that "Award will be made in the aggregate for items 1 through 4 * * * [with] the low aggregate bidder * * * [to] be determined by multiplying the rates quoted for straight time and overtime by the estimated number of personnel per day, and adding the resultant extension."

Bids were opened on June 8, 1983. Of the six bids received, Northern Virginia Van Company's was found to be the lowest—at least when evaluated according to the method given in the solicitation. No award was made, however. Instead, in a "determination and findings" formally entered several weeks later, the contracting officer undertook to reject plaintiff's bid, and also that of the second lowest bidder, on the ground that each had submitted a bid that offered "no charge or minimal charges on item 1, (Vehicle W/Driver) which has low weight factors [i.e., low estimated usage] and inflated prices on item 3 (Laborers) which has the larger weight factors." [1]

1. Item 1 of the bid schedule (Vehicle w/Driver) listed the estimated needs for this contract service as 3 per day on a regular eight-hour shift and 2 per day for overtime needs. On each of

This fact, taken in conjunction with the contracting officer's further observation that the using agency usually ordered from three to ten times more laborers (item 3) than vehicles with drivers (item 1) led to the conclusion that the two bids were not only mathematically but also materially unbalanced [2] in that "[t]here exists a reasonable doubt that award to either bidder will not [sic] result in the lowest ultimate cost to the Government." In keeping with this conclusion, the Government indicated its intention to make the award to the next lowest ranking responsible bidder.

A complaint seeking declaratory and injunctive relief against the contracting agency's proposed award was filed here on August 1, 1983. Through the evidence gathered at trial (held August 2–3, 1983), it was established, *inter alia:* (i) that the estimates given in the solicitation were regarded by the Government as being the best available in that they had been drawn from the prior year's contract experience (a contract of like dollar magnitude), (ii) that notwithstanding the credibility of these estimates, the contracting officer nevertheless thought it appropriate—indeed, necessary, because of the mathematically unbalanced nature of plaintiff's bid—to assess the relative competitiveness of that bid by applying its hourly rates to ordering patterns different from the average usage factors reflected in the bid schedule, and, (iii) that when evaluated against these labor-intensive, theoretical ordering patterns, plaintiff's bid failed

to maintain its lowest cost ranking and, hence, was judged to be materially unbalanced.

In the court's view, this analytical excursion by the contracting officer was legally unacceptable: it was contractually impermissible in that it flatly violated the method of award determination specified in the solicitation; and it was logically indefensible—hence, irrational—in that it rejected acceptable estimates in favor of conjectural ordering patterns. Upon this assessment of the merits of plaintiff's suit, and being similarly convinced by other evidence directed to satisfying the remaining criteria for injunctive relief, the court granted a preliminary injunction.

As indicated earlier, within a week of the preliminary injunction's issuance, the contracting officer decided to cancel the enjoined solicitation and to procure the same services by issuing a new solicitation—an action taken on August 10, 1983.

In support of this action (and as otherwise required by regulation) the contracting officer prepared written findings outlining the factual bases for the determinations to cancel and resolicit. Among other points, these findings noted the following: (i) that the prohibition against "no charge" bids which had been added to the language of Solicitation No. 1056 (the amending language quoted *supra* at 3) had been intended by the Government to preclude unbalanced bids, (ii) that this purpose had not been

---

these two bid categories plaintiff entered an hourly rate of $0.01 (*i.e.*, one cent); similarly, the second low bidder proposed a single hourly rate of ten cents. By contrast, among the bids not found facially objectionable by the contracting officer, the quoted rates for item 1 hours ranged from a low of $9.00 and $13.00 respectively to a high of $16.00 and $20.00.

With respect to item 3 of the bid schedule (Laborers), estimated personnel requirements were shown at 16 per day on a regular eight-hour basis and 20 per day to accommodate overtime needs. Here plaintiff submitted descending hourly rates of $9.15 and $5.08 respectively; the second low bidder, in like pattern, proposed hourly rates of $25.10 and $11.10. But among the other offerors, the bids ranged from a low of $7.00 and $10.50 (for

straight and overtime hours) to a high of $8.00 and $12.00.

2. A mathematically unbalanced bid identifies a bid in which each component of the bid price fails to carry its fair share of cost and profit so that, in the overall, the bid reveals nominal prices for some work and enhanced prices for other work. A materially unbalanced bid, on the other hand, refers to a mathematically unbalanced bid whose disproportionate pricing, when evaluated in light of the Government's needs, engenders a reasonable doubt that acceptance of the bid will result in the lowest ultimate cost to the Government. *Edward B. Friel, Inc.,* 55 Comp.Gen. 231 (1975), 75–2 C.P.D. ¶ 164; *see also TWI Inc.,* 55 Comp.Gen. 99 (1981), 81–2 C.P.D. ¶ 424.

accomplished in full in that two of the six bids received were clearly mathematically unbalanced, (iii) that because of this disparity in contractor pricing approach (between balanced and unbalanced bids) the Government was disadvantaged in its efforts to properly and fairly evaluate all bids and, hence, could not reasonably determine the lowest ultimate cost contractor absent (and this rest is implied) recourse to extra-contractual estimates of the sort whose use the injunction had faulted.

The findings go on to recite that the delay that could be expected in connection with an appeal of the injunction would postpone fulfilling the Navy's pressing needs for contract moving services substantially beyond the time necessary to accomplish a resolicitation. The urgency of the Navy's needs dictated minimization of delay—a fact which the contracting officer translated (upon advice of counsel) into a "compelling reason" for cancellation within the meaning of the applicable procurement regulation.

Based upon these findings, the contracting officer determined that all bids were to be rejected because of a defective solicitation and, to minimize delay, the matter would be resolicited. From these actions, this second round of litigation followed.

## Discussion

■ We begin the discussion by considering again, at the Government's urging, an argument it had raised in opposition to plaintiff's initial motion for injunctive relief and which is offered once more as a ground for dismissal.

The position contended for is that a contracting officer, when assessing the cost implications to the Government of a mathematically unbalanced bid, should not be restricted to evaluating the bid in light of the estimates given, but may, instead, "consider the degree to which actual needs may depart from the estimates contained in the solicitation." And when, through such an examination, it is seen that the apparent low bid is not so in fact, then the contracting officer has the right—so the argument

continues—to reject that bid in favor of one that meets the test of lowest ultimate cost under the restructured estimates.

As part of the argument, the Government would distinguish between erroneous estimates (for which, it concedes, the only lawful remedy would be cancellation and resolicitation) and estimates which, even though the best available, yet are addressed to projected requirements "inherently speculative" in character.

The argument is no more appealing now than upon first hearing. The relevant statute, 41 U.S.C. § 253(b) (1976), specifies, with regard to advertised contracts, that "Award shall be made * * * to that responsible bidder whose bid, *conforming to the invitation for bids,* will be most advantageous to the Government, price and other factors considered * * * [Emphasis supplied.]." Clearly, it would undermine the very essence of the competitive bidding process to allow a contracting officer to remedy perceived (or supposed) deficiencies in solicitation-stated estimates by evaluating bids under criteria different from those upon which the bids were solicited. The Comptroller General has articulated the same view. See *Edward B. Friel, Inc.,* 55 Comp.Gen. at 239, 75–2 C.P.D. ¶ 164 at 10.

Hence, the distinction which the Government would have the court accept, between procurement needs that have been erroneously stated and those considered not susceptible to reasonably accurate quantification, is really no distinction at all. Neither may be remedied by "corrective" adjustments injected at the time of bid evaluation. Contractors are entitled to know how their bids will be evaluated; they cannot effectively compete when the standards for judgment exist only in the contracting officer's head.

It may be that a different rule should obtain where the solicitation language specifically cautions bidders that a materially unbalanced bid may be rejected as non-responsive. But whether cautionary language of that sort can be contractually meaningful outside of the context in which

it normally occurs, *i.e.*, in the evaluation of unbalanced bidding between base and option quantities,[3] is something that need not be decided here. There was no language of that sort in this solicitation; hence, there was no authority in the contracting officer to reject Northern Virginia Van Company's low bid by evaluation standards never specified in the solicitation.

A different result follows with regard to the decision to cancel. As brought out in the facts previously recited, the amendment language that cautioned against the submission of "no charge" bids had been added by the contracting officer to deter unbalanced bids. That is, the intent was to preclude, by deeming non-responsive, bids whose constituent elements (meaning here the separate line items of the bid schedule) had been priced disproportionately to their true economic cost. But, as further noted, that purpose fell short of its goal in that two of the six bids received, though in literal compliance with the no-charge prohibition, were yet so obviously unbalanced as to frustrate the contracting officer's objective.

Mere frustration of purpose was not, however, the only harm. Indeed, had the injury been limited to that only, it would be doubtful that cancellation of the solicitation could have been justified. Rather, as the contracting officer went on to explain, the imbalance in the bids suggested a likelihood that the bidding had not proceeded on a common understanding: some bidders took the no-charge prohibition as it had been intended; others saw it as insisting upon nothing more than token compliance. The evidence, in other words, pointed toward a conclusion that the solicitation's language was ambiguous, hence, defective.

Plaintiff argued against this interpretation claiming that, since none of the other bidders had voiced a protest, one could assume that no misunderstanding had actually occurred. What cuts the other way, however, is that unbalanced bidding was described as being the industry norm. Given that norm, when four out of six bidders offer what appear to be balanced bids, it seems more likely than not that the practice was abandoned, not out of preference, but to insure bid responsiveness.

Upon these facts then, the Government's decision to cancel took hold. The governing regulation, Federal Procurement Regulation § 1–2.404–1 (32 C.F.R. § 1–2.404–1 (1982)) demands that, once bids have been opened, there be no cancellation of the procurement absent a "compelling reason". The regulation also contains a nonexclusive list of circumstances which may constitute such reasons. Examination of this list indicates a focus upon two fundamental concerns justifying cancellation: a compromise of the competitive process; or a misapplication of public funds.

The facts of this case present a situation precisely within the regulation's defined interests. The misalignment in the bid price structure reasonably suggests that the bidders had two different understandings of the no-charge prohibition, which thus placed them on unequal footing in the competitive bidding process. Therefore, even though it was unacceptable to reject plaintiff's bid as nonresponsive simply because it fell out of line with the others (the bid, in fact, was in compliance with the solicitation's language), nevertheless, it would be equally objectionable to prefer that bid to others which had proceed-

3. Defense Acquisition Regulations call for the inclusion of the following language in solicitations for fixed-price contracts involving bids covering base and option quantities:

"Evaluation of Options

A. Bids and proposals will be evaluated for purposes of award by adding the total price for all option quantities to the total price for the basic quantity. Evaluation of options will not obligate the Government to exercise the option or options.

B. Any bid or proposal which is materially unbalanced as to prices for basic and option quantities may be rejected as non-responsive. An unbalanced bid or proposal is one which is based on prices significantly less than cost for some work and prices which are significantly overstated for other work." 32 C.F.R. § 7–2003.11(b) (1982).

ed upon a different, but equally reasonable, assumption. Hence, only by cancellation and resolicitation could the Government actually achieve the equilibrium which would best serve the competitive bidding system.

As a final matter we address briefly the Government's contention that cancellation was also justified in light of the delay that would have attended an appeal of the court's preliminary injunction. The same argument had been presented by the Government in *P. Francini & Co., Inc. v. United States*, 2 Cl.Ct. 7 (1983) and was there accepted by the court. *Id.* at 10. Here, however, the argument did not prevail. Given the difference in outcome and the forcefulness with which the point was pressed, it becomes appropriate to restate the court's view.

The difficulties this court found in the Government's position began with the fact that the asserted urgency of the Navy's needs had been squarely addressed in the testimony and argument that was offered in opposition to the plaintiff's original request for injunctive relief. The court, in determining to grant that relief, considered the competing public interest factors and judged the need to vindicate the principle of fair dealing in competitive procurements a larger concern than the Government's need to avoid a procurement delay. Indeed, the judgment could hardly have been otherwise given the rule that injunctive relief should only be denied in the face of irrational procurement action "where [such] relief would delay or interfere with supply of items urgently needed in military operations." *Serv-Air, Incorporated v. Seamans*, 473 F.2d 158, 160 (D.C.Cir.1972). In this case, the failure to timely satisfy the Government's needs risked hardly more than a large measure of administrative inconvenience.

The court, having made the judgment that it did, should not have been subjected to second guessing by the Government. Yet that is what the cancellation, had it rested only on delay avoidance, would plainly have amounted to: an effort by the Government to satisfy, albeit under a dif-

ferent solicitation label, precisely the same procurement needs whose purchase from sources other than plaintiff the court had preliminarily enjoined. It is plain enough that such an "end-around" totally frustrates the object for which the suit was brought. Thus, to tolerate it can only breed disrespect for the competitive procurement system and the court's limited, yet important, role in that system.

A second and perhaps more basic objection to the Government's position went to the fact that procurement delay was not an unavoidable consequence of the litigation—the injunction never foreclosed the Government from proceeding immediately with an award to plaintiff. Rather, the complained-of delay was a hindrance borne of the Government's persistence in holding to a position which the court had declared to be unlawful and irrational, and thus violative of the fundamental obligation of fairness in competitive procurement.

That the Government should offer that same self-caused delay to justify yet another intrusion upon the competitive bidding system (in the form of a cancellation after bid opening) hardly seemed to comport with the purpose or letter of the governing regulation. Indeed, the cancellation would amount to nothing more than the administrative route by which the Government would free itself of the injunction's constraints at the expense of the integrity of the competitive bidding system. Upon this reasoning, the court rejected the idea that, in this case, delay-avoidance was a "compelling reason" justifying cancellation.

## CONCLUSION

The court's bench ruling of August 19, 1983 denied plaintiff's application for permanent injunction, ordered dissolution of the preliminary injunction entered on August 3, 1983, sustained the Government's right to proceed with a cancellation and resolicitation (on the ground of defective specifications) and granted the Government's motion to dismiss plaintiff's actions. For the reasons given herein, these rulings are reaffirmed.