**INTERNATIONAL GRAPHICS, DIVISION OF MOORE BUSINESS FORMS, INC., Plaintiff,**

and

**Jeffries Banknote Company, Intervenor,**

v.

**The UNITED STATES, Defendant.**

**No. 586–83C.**

United States Claims Court.

Dec. 23, 1983.

Robert D. Wallick, Washington, D.C., for plaintiff. Steptoe & Johnson, Washington, D.C., of counsel.

William Dickey, Washington, D.C., for intervenor.

Stephen Bergenholtz, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This is a bid protest case brought on September 22, 1983, by plaintiff, International Graphics, an unincorporated division of Moore Business Forms, Inc., to restrain an award, and thereafter to restrain the cancellation of a solicitation issued by the Government Printing Office (GPO) under "Program 114–S" respecting the procurement requirements of the Commerce Business Daily (CBD).[1] Following the filing by plaintiff in this court of its complaint for a declaratory judgment, and its motions and applications for temporary, preliminary, and permanent injunctions, the contracting

officer cancelled the solicitation on October 3, 1983. This was done ostensibly because retention of the activity in-house would effect a $1.2 million savings to the government over the life of the contract.

Jeffries Banknote Company (intervenor), also a bidder herein, on September 29, 1983, moved, and was allowed, to intervene in this action. Since plaintiff's complaint contended that intervenor was non-responsive, intervenor initially sided against plaintiff. However, upon the cancellation of the solicitation by GPO, and for purposes of the *present* dispositive issues before the court, intervenor sides with the plaintiff.

On October 3, 1983, in response to the initial pleadings by plaintiff to restrain the *award* of Program 114–S, GPO also filed in this court Defendant's Motion To Dismiss In Part, Or In The Alternative, For Summary Judgment And Opposition To Plaintiff's Motions For Injunctive And Declaratory Relief. Following the cancellation of the solicitation, defendant filed in this court on October 20, 1983, a supplemental motion for summary judgment. This latter motion, on the cancellation issue, was premised on the grounds that, as a matter of law, the GPO could cancel said solicitation, pursuant to the regulations, for a "compelling reason" and/or for no reason in that it reserved the right to do so.

In the interim, on September 22, 1983, Judge Harry Wood of this court denied plaintiff's motion for a TRO as moot and unnecessary in view of defendant's stipulation not to award the contract prior to October 5, 1983. He also recused himself from subject case on September 30, 1983, pursuant to 28 U.S.C. § 455(b)(4). However, before a hearing could be held on the preliminary injunction, following reassignment to this court, regarding the *award* issue, defendant abruptly cancelled the solicitation. Following subsequent pleadings by plaintiff seeking, thereafter, also to restrain the cancellation of the solicitation,

---

1. The Commerce Business Daily is a publication issued by the Department of Commerce, on a daily basis, listing in brief descriptive paragraphs United States Government procurement invitations, contract awards, subcontracting leads, and sales of surplus government property. For the past 33 years, the GPO has printed this publication.

this court granted plaintiff's motion on October 7, 1983, by issuing a preliminary injunction restraining the award and the cancellation of the solicitation under Program 114–S.

Jurisdiction over this action in this court is premised upon 28 U.S.C. § 1491(a). Plaintiff further contends that 28 U.S.C. §§ 2201 and 2202 are also supportive thereof.

This opinion addresses only the issues raised in defendant's motions to dismiss and for summary judgment filed on October 3 and 20, 1983. Because this court finds that substantial genuine issues of material fact exist, defendant's motions for summary judgment are denied. Additionally, defendant's motion to dismiss, premised on lack of jurisdiction, is also denied for the reasons delineated hereinafter.

### FACTS

Defendant, acting through the Government Printing Office (GPO), issued a solicitation styled Program 114–S on February 24, 1982. Said solicitation, as reflected in the letter of transmittal to prospective bidders, advised as follows:

This letter concerns the requirements for procurement of the "Commerce Business Daily" advertised as Program 114–S . . . . The Government Printing Office is doing a feasibility/cost analysis for the requirements of the "Commerce Business Daily." *This will be accomplished as outlined in OMB Circular No. A–76.* (Emphasis added.)

This solicitation is in part for information and planning purposes and consequently, it may be that the Government *will not* award a contract on the basis of this solicitation. The Government in no event intends *to pay for the information herein* solicited.

A pre-bid conference was subsequently held on Program 114–S on March 9, 1982, which was attended by prospective bidders, including plaintiff. Pertinent to the issues herein, *inter alia,* the following bidder questions and GPO responses occurred:

Q. Can you provide a copy of OMB Circular No. A–76 referred to in your letter of February 24, 1982?

A. Yes.

Q. Will provisions of A–76 be used as criteria for proposals?

A. GPO is not bound by OMB A–76 *but adopts its theory in principal* [sic]. (Emphasis added.)

Threshold informative and instructive data contained in the February 24, 1982 solicitation included, but was not limited to, the following:

The Government Printing Office (GPO) *intends* to issue a Single Award Term Contract for the publication and distribution of the Commerce Business Daily (CBD) for the Department of Commerce by the method known as Two-Step Formal Advertising.

Two-Step Formal Advertising is a method of procurement conducted in two phases.

STEP ONE: The first step consists of the solicitation, submission, evaluation and, if necessary, discussions of a technical proposal, without pricing, to determine the acceptability of the proposal offered.

STEP TWO: The second step consists of the issuance of formal Invitations for Bids (IFB's) to those Offerors that submitted acceptable technical proposals under STEP ONE.

\*      \*      \*      \*      \*      \*

The contract *when awarded* will include all bid prices plus all unrestricted narrative responses of the selected offeror . . . .

\*      \*      \*      \*      \*      \*

. . . Each bid price must be based on the bidder's *own* proposal . . . .

\*      \*      \*      \*      \*      \*

. . . *The Contractor shall be legally obligated to perform in strict accordance with its Technical Proposal submitted* hereunder. Failure to comply with the requirements will be grounds for "Termi-

nation for Default" under the contract. (Emphasis added.)

On July 29, 1982, plaintiff submitted its initial Technical Proposal as required by "Step One," which was revised, consistent with the solicitation, on November 11, 1982.

Following the formal approval of plaintiff's revised technical proposal on April 29, 1983, defendant forwarded the GPO's formal request to plaintiff, by letters dated August 15, 1983, which invited compliance with "Step Two" of the solicitation, *i.e.,* submission of price bids. To said letter was affixed a nine-page attachment entitled:

Part Two Invitation For Bids
Program 114–S, Commerce Business Daily
Single Award.

The Invitation For Bids (IFB) [2] disclosed, *inter alia,* that (a) "award will be made" to the responsive, responsible bidder whose total aggregate cost results in the lowest bid; and (b) bids must be submitted for all lots and for all items therein; however, defendant reserves the right to award "by lots or any combination thereof."

The lots, upon which bids were required, were delineated into four categories as follows:

| Lot | Description of Services Sought | Services Currently Performed By |
|---|---|---|
| 1 | Editorial | DOC [3] |
| 2 | Typesetting ADP Capability | Commercial Contractor DOC |
| 3 | Printing/Binding | GPO |
| 4 | Subscription Management | SOD [3] |

Pursuant to the IFB, plaintiff submitted two separate bid packages respecting the foregoing descriptive services on September 15, 1983, consisting of a "Total Package Bid" as authorized by Amendment No. 2, and an individual lot bid as follows:

**2.** GPO executed two amendments to Part Two of the IFB in early September 1983. The second amendment provided, *inter alia,* that "in addition to the lot prices required the bidder at his/her option may submit an alternate bid for a total package price."

| Bid Lots | Description of Services | Plaintiff's Bid Prices | |
|---|---|---|---|
| | | Aggregate | Individual Lots |
| 1 | Editorial | $ 308,581 | $ 345,823 |
| 2 | Typesetting ADP Capability | 715,434 | 801,315 |
| 3 | Printing/ Binding | 2,335,567 | 2,335,572 |
| 4 | Subscription Management | 116,138 | 125,269 |
| | | $3,475,900 | $3,607,979 |

The contracting officer opened all bids on September 16, 1983, and the following determinations were made with respect to each bidder:

| Bidder | Contracting Officer's Determination |
|---|---|
| (1) Des Plains Publishing Co. | . . "did not bid all items and is therefore non-responsive" |
| (2) R. R. Donnelly & Sons | . . "bid on lot four only and is therefore non-responsive" |
| (3) Western Publishing Co. | . . "submitted a no bid" |
| (4) International Graphics | . . "submitted a base bid and an alternate bid" |
| (5) Jeffries Banknote Company [4] | . . "submitted a base bid and an alternate bid" |
| (6) GPO [4] | . . "submitted one bid from the Central Office and four bids from the Chicago Regional Plant. In all of the GPO bids the low contractor bid price was used for lots one and two for evaluation purposes." |

Stemming from information and belief, plaintiff reasoned that defendant imminently contemplated awarding the contract pursuant to Program 114–S as follows:

| Lot # | Prospective Awardee | Estimate/Bid |
|---|---|---|
| 1 | Jeffries | $ 300,600 |
| 2 | Jeffries | 614,895 |
| 3 | GPO (in-house) | 2,078,261 |
| 4 | GPO (in-house) | 266,263 |
| | | $3,260,019 |

Against said background and harboring the conclusion that "the solicitation has departed in material respects from the requirements of OMB Circular A–76 and that the government estimates should be disregarded," plaintiff so advised the contracting officer in a letter dated September 20, 1983, by:

**3.** DOC is the Department of Commerce. SOD is the Superintendent of Documents.

**4.** The bids of said bidders as to the respective lots are scheduled in Attachment A.

(a) protesting, anticipatorily, the award of a contract under Program 114–S to anyone other than International Graphics;

(b) requesting the administrative review/appeal mandated by § 11, OMB Circular A–76; and

(c) requesting that no action be taken on subject solicitation until the protest/review/appeal are resolved.

In a separate letter also dated September 20, 1983, plaintiff protested any contemplated award to Jeffries on the grounds that it was not responsive in that the company did not sign or submit GPO Form 910 which is essential to creating a legal obligation.[5] Whereas defendant did not honor plaintiff's request for a review/appeal respecting the perceived action of defendant as viewed by plaintiff, the complaint and motions for injunctive relief were filed in this court on September 22, last, seeking to enjoin award of the contract under Program 114–S to anyone other than plaintiff. And following said filed complaint and motions for injunctive relief, defendant cancelled the solicitation on October 3, 1983, the linchpin being an anticipated "[savings of] $242,506 per year or $1,212,530 over the 5 year contract life."

## DISCUSSION

Plaintiff's suit is based upon the claim that the GPO's determination that $1.2 million would be saved by cancelling subject solicitation is arbitrary, capricious, and without a rational basis. It alleges that the GPO was obliged to follow the principles of Office of Management and Budget (OMB) Circular A–76 (sometimes referred to as A–76), either as a matter of law or as an integral part of the solicitation under Program 114–S, and that the GPO did not comply with said obligation. Plaintiff also challenges the GPO's determination that $1.2 million would be saved, regardless of whether the agency has complied with A–76. Defendant's response to this claim, in its motions to dismiss and for summary

judgment, contends that this court has no jurisdiction over plaintiff's claim; that the government reserves the right to cancel all solicitations without liability for no reason; and that in any event, this court cannot review whether the GPO has complied with the provisions of A–76. Moreover, it concludes that its judgment that a $1.2 million cost savings would be effected from cancellation of subject solicitation must be upheld as a matter of law, since it constitutes a "compelling reason" under applicable regulations.

Given the foregoing, the court views defendant's motions and plaintiff's responses thereto as presenting the following three major issues:

1) Whether this court has jurisdiction over plaintiff's complaint for equitable relief against the cancellation of the solicitation under Program 114–S;

2) Whether a "compelling reason" was necessary for the GPO to cancel its solicitation under Program 114–S; and

3) Whether, as a matter of law, plaintiff can judicially challenge defendant's determination of cost savings (i.e., raise a genuine issue of material fact), and if so, whether this court can review the charge that said determination did not comply with the principles of OMB Circular A–76.

For the reasons stated below, the court is of the firm opinion that each of the foregoing questions must be answered in the affirmative.

### I. Jurisdiction

Defendant has strenuously contended that this court has no jurisdiction over plaintiff's claim for equitable relief with respect to the GPO's cancellation of its solicitation, on the following grounds:

a) that this court lacks jurisdiction, ab initio, over contract claims in which the government has discriminated against all private bidders equally;

---

**5.** Plaintiff filed a motion for summary declaratory judgment on October 25, 1983, seeking a determination that Jeffries is nonresponsive.

This motion will be disposed of at the appropriate time.

b) that Congress intended this court to exercise its injunctive powers only when a contract will be awarded, and no contract will be awarded here; and

c) that the relief plaintiff seeks, *i.e.*, an order enjoining the cancellation of the GPO's solicitation, would be tantamount to the court's affirmative award of a contract to plaintiff.[6]

The court finds each of these contentions to be without merit.

▉ We observe, at the outset, that defendant has noted correctly that the equitable jurisdiction of this court under 28 U.S.C. § 1491(a)(3)[7] can only be invoked when there is a breach of the implied contract to fairly and honestly consider all responsive bids. *United States v. Grimberg*, 702 F.2d 1362, 1367 (Fed.Cir.1983); *Ingersoll-Rand Co. v. United States*, 2 Cl.Ct. 373, 375 (1983). Defendant is likewise correct in its assertion that Congress's waiver of sovereign immunity in § 1491(a)(3) is to be strictly construed and may not be expanded by implication. *Speco Corp. v. United States*, 2 Cl.Ct. 335, 336–37 (1983); *see also United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–954, 47 L.Ed.2d 114 (1976).

▉ Defendant ventures beyond the realm of precedent, however, when it argues that this court lacks "bid protest" jurisdiction when alleged grievances relate to all bidders equally, without discriminating against one particular bidder. This transgression is particularly true because "[t]he obligation of the government upon the issuance of a solicitation is to treat *all* bidders fairly and to give full consideration to all bids." *Heli-Jet Corp. v. United States*, 2 Cl.Ct. 613, 618 (1983); *see Keco Industries,*

*Inc. v. United States (Keco I)*, 192 Ct.Cl. 773, 780, 428 F.2d 1233 (1970); *Heyer Products Co., Inc. v. United States*, 135 Ct.Cl. 63, 69, 140 F.Supp. 409 (1956). The reason for court enforcement of this obligation is to protect against arbitrary and capricious action by government agencies in the procurement process. *See Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C.Cir. 1970); *quoted in Keco I*, 192 Ct.Cl. at 780, 428 F.2d 1233. The foregoing policy underlying this court's bid protest jurisdiction would lose some, if not all, of its force if this court had the power to review unfair treatment of a *particular* bidder but was powerless to review equally unfair treatment of *all* bidders by the government.

The points relied on in the cases cited by defendant to support such theory[8] are inapposite. A number of the decisions cited by defendant have affirmatively stated that this court has jurisdiction when the government has discriminated among bidders. *See, e.g., Heli-Jet Corp.*, 2 Cl.Ct. at 618; *Essex Electro Engineers, Inc.*, 3 Cl.Ct. at 281 n. 3. No decision of this court, as we read them, has gone so far as to hold, however, that jurisdiction is lacking because a complainant alleges that the government has denied *all* bidders, rather than one or more individual bidders, the chance to compete fairly for a contract. And, to the extent that any Claims Court case can be reasonably so read, we would respectfully disagree with such a holding. This court has in fact declined to so hold in other cases when plaintiffs have protested the government's cancellation of a solicitation. *Northern Virginia Van Co. v. United States*, 3 Cl.Ct. 237 (1983); *P. Francini & Co., Inc. v. United States*, 2 Cl.Ct. 1, 6 (1983).

---

6. Defendant also premised its "Motion To Dismiss In Part" upon this court's lack of jurisdiction to review whether the GPO has complied with the provisions of A–76. This contention will be discussed in part III, *infra.*

7. This statute reads in pertinent part: "To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable relief

as it deems proper, including but not limited to injunctive relief."

8. *Quality Furniture Rentals, Inc. v. United States*, 1 Cl.Ct. 136, 140 (1983); *Cecile Industries, Inc. v. United States*, 2 Cl.Ct. 690, 693 (1983); *Ingersoll-Rand Co. v. United States*, 2 Cl.Ct. 373; *Downtown Copy Center v. United States*, 3 Cl.Ct. 80 (1983); *Heli-Jet Corp.*, 2 Cl.Ct. 613; and *Essex Electro Engineers, Inc. v. United States*, 3 Cl.Ct. 277, 281 n. 3 (1983).

The decision relied upon most heavily by defendant in support of its proposition is *Quality Furniture Rentals Inc.,* 1 Cl.Ct. at 140. *Quality Furniture* is significantly distinguishable from the instant case in that it involved a challenge to an agency's *authority to award* a contract. In justifying its holding that the Claims Court had no jurisdiction to enjoin the award, the decision interpreted the legislative history accompanying the Federal Courts Improvement Act (FCIA) of 1982 as indicating that Congress intended this court to consider "only those irregularities which would deny a contractor a fair opportunity to compete." 1 Cl.Ct. at 140. The court ruled that it lacked jurisdiction because the government would not be denying any bidder the opportunity to compete for the award, even if such an award was unauthorized. This holding contrasts significantly with defendant's sweeping contention that the court lacks jurisdiction whenever the government equally denies all bidders the opportunity to compete for an award, without regard to whether such denial was violative of its obligation to treat all bids fairly.

Moreover, defendant's theory is premised upon an unduly narrow interpretation of the legislative history of the FCIA. The Senate Report accompanying the FCIA quoted by *Quality Furniture* specifies that the substantive law of jurisdiction over bid protest cases, as enunciated in the *Scanwell* doctrine, was intended to be left intact. S.Rep. No. 275, 97th Cong., 1st Sess. 23 (1981); *see CACI, Inc.-Federal v. United States,* 719 F.2d 1567 (Fed.Cir.1983). The decision of our predecessor court that adopted the *Scanwell* doctrine, *Keco I,* stated that the court's jurisdiction should not be limited "only to those situations involving favoritism or discrimination" by the government. 192 Ct.Cl. at 780, 428 F.2d 1233. Instead, the court adopted the holding of *Scanwell* permitting judicial review over all agency actions that are arbitrary and capricious—*i.e.,* those that "exceed the legal perimeters" of agency discretion. *See id.* at 782, 428 F.2d 1233; *Scanwell,* 424 F.2d at 874.

■ The factual setting of the instant case also compels a finding of jurisdiction here, notwithstanding defendant's contention that this court's equity jurisdiction obtains only when a contract remains to be awarded. Plaintiff in this case clearly invoked the jurisdiction of this court by filing for a temporary restraining order against the award of a contract under Program 114–S to other bidders on September 22, 1983, while subject solicitation was still outstanding. A subsequent cancellation of the solicitation by defendant, like the subsequent award of a contract, does not act as a bar to the "long-standing rule in the Federal courts that jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties." *F. Alderete General Contractors, Inc. v. United States,* 715 F.2d 1476, 1480 (Fed.Cir.1983); *see Dean Forwarding Co., Inc. v. United States,* 2 Cl.Ct. 559, 564 (1983), and cases cited in n. 9 therein. *Alderete* supplemented *Grimberg* by establishing that the statutory language affording equitable relief in this court "for claims brought before the contract is awarded" should be given its plain meaning so as to preclude subsequent agency action from divesting this court of jurisdiction, once jurisdiction is established. 715 F.2d at 1481. Because similar policy considerations to those guiding the court in *Alderete* apply here (see *id.* at 1480), defendant's argument that this court loses jurisdiction upon the cancellation of the solicitation, "when there is no longer a contract to award," is thoroughly misplaced under the facts of the instant case.

■ The third jurisdictional ground proffered by defendant is that this court has no authority to enjoin the cancellation of a solicitation, because such a remedy would be tantamount to directing the award of a contract to a particular bidder. Although we have no misgivings that this court's jurisdiction is not so broad as to contemplate the affirmative award of a contract to a particular bidder, defendant has failed to show how this impediment applies to deprive the court of jurisdiction to enjoin the

cancellation of the solicitation. In *CACI, Inc.-Federal,* 719 F.2d at 1574–1575, the Court of Appeals for the Federal Circuit stated that:

> *Scanwell* ... recognized that a disappointed bidder has "no right ... to have the contract awarded to it in the event the ... court finds illegality in the award of the contract ...." 424 F.2d at 864.

The court in *CACI* then went on to hold, however, that:

> The injury [plaintiff] here asserts is that the government's breach of its implied contract to deal fairly with all bidders denied [it] the opportunity to have its bid considered solely on its merits. An injunction barring the award would correct the alleged injury since it would require the government, if it wants to go ahead with the procurement, to repeat the bidding process under circumstances that would eliminate the alleged taint of the proceedings.

*Id.* at 1575.

In the instant case, plaintiff demands that the court enjoin the GPO's October 3, 1983 cancellation of its solicitation, because allowing the cancellation to stand would breach the implied contract of fairness that attaches to all government procurements. If plaintiff succeeds on the merits in this suit, the solicitation under Program 114–S would be restored and the award enjoined to any unentitled bidders. In such circumstances, the remedy envisaged in *CACI, supra,* would conceivably become available here. Because in such instance the court would not be affirmatively awarding a contract to a particular bidder, this court has jurisdiction to grant the remedy sought by plaintiff.

II. *Compelling Reason For Cancellation*

The rule governing the cancellation of IFBs is stated as follows in the regulations applicable to the GPO:

> Preservation of the integrity of the competitive bid system and prevention of unnecessary exposure of bid prices dictate that, after bids have been opened, award *must* be made to that responsible bidder who submitted the lowest responsive bid, *unless* there is a *compelling* reason to reject all bids and cancel the invitation. (Emphasis added.)

GPO Printing Procurement Regulation, § IV.2.[9] Accordingly, plaintiff contends that the government is only entitled to cancel its solicitation, under the facts here, if it can demonstrate a compelling reason for doing so. Defendant responds by asserting that no compelling reason was necessary, for essentially the following two reasons:

a) The government "retains, in its discretion, the right to reject all bids without liability"; and

b) The solicitation under Program 114–S was "for informational and planning purposes," rather than an "Invitation for Bids," and therefore was not subject to the regulations governing the cancellation of IFBs.

The court accepts plaintiff's contention and rejects those of defendant.

The primary support for defendant's first argument is derived from language contained in three opinions of our predecessor court. *See American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 374, 587 F.2d 54 (1978); *Keco Industries, Inc. v. United States (Keco II),* 203 Ct.Cl. 566, 577, 492 F.2d 1200 (1974); and *Robert Simmons & Associates v. United States,* 175 Ct.Cl. 510, 517, 360 F.2d 962 (1966). The references made in these cases to the agencies' ability to reject all bids without liability cannot be interpreted as giving the government *carte blanche* to cancel solicitations inimical to applicable regulations, however. To the contrary, the discussion of an agency's right to cancel a solicitation in each

---

9. Virtually identical provisions are found in the Federal Procurement Regulations (FPR), 41 C.F.R. § 1–2.404–1(a) (applicable to most civilian procurement) and the Defense Acquisition Regulations (DAR), 32 C.F.R. § 2–404.1(a) (applicable to Department of Defense procure-ment). Each of these regulations was promulgated under statutes that permit the agency head to reject all bids upon a determination that rejection is in the public interest. *See* 41 U.S.C. § 253(b) (1979); 10 U.S.C. § 2305(c) (1979).

case was tempered with specific references to the above-cited FPR and DAR that require a compelling reason for cancellation, *American General Leasing,* 218 Ct.Cl. at 375, 587 F.2d 54; *Keco II,* 203 Ct.Cl. at 577, 492 F.2d 1200, or to an analogous caveat that an agency's cancellation of a solicitation would not be upheld if it is arbitrary, capricious, or in bad faith. *Simmons,* 175 Ct.Cl. at 517, 360 F.2d 962. The Court of Claims decision on point that most accurately delineates the standards for cancellation is still *Massman Construction Co. v. United States,* 102 Ct.Cl. 699, 718–19, 60 F.Supp. 635 (1945), which states:

> To make the system work without undue delays and without the opening of the bids being used unfairly to obtain a disclosure of what competitors are offering, it is necessary that the bids be firm bids, backed by a guaranteed willingness to sign a contract at the bid price. *To have a set of bids discarded after they are opened* and each bidder has learned his competitor's price is a serious matter, and it *should not be permitted except for cogent reasons.* (Emphasis added.)

■ Defendant's second theory that a compelling reason is not required is premised on the contents of the GPO's February 24, 1982 letter of transmittal, which states that the solicitation was "in part for information and planning purposes," that "it may be that the Government *will not* award a contract," and that "[t]he Government in no event intends to pay for the information herein solicited." Defendant concludes that, given these provisions, the GPO's solicitation was "identical" to a procedure permissible under FPR § 1–1.314. Said regulation permits "requests for informational or planning purposes," provided that such requests "shall clearly state

[their] purpose, explaining that the Government does not intend to award a contract on the basis of the request, or otherwise pay for the information solicited."

Defendant's argument falls wide of the mark for several reasons. First, the GPO Printing Procurement Regulations do not contemplate a "solicitation for informational or planning purposes." (The provisions of the FPR by their own terms are not binding on the GPO.[10]) Second, even if the GPO could proceed pursuant to FPR § 1–1.-314 under a principle of the "federal norm" in procurement as suggested by defendant, its solicitation in Program 114–S was clearly at gross variance with the terms and intent of the regulation. Contrary to the regulation's requirements, the solicitation in the instant case was only *in part* for informational and planning purposes. More importantly, the solicitation contained no clear statement of agency intent *not* to award a contract. Instead, the letter of transmittal stated only that it *may be* that the agency will not award a contract, and the attached RFP noted that the GPO "intends to issue a . . . contract for the publication and distribution of the . . . (CBD)," under the Two-Step Formal Advertising method, if a private bid was acceptable. Indeed, the RFP effectively compelled all bidders to treat the entire solicitation as an IFB, because it "legally obligated [bidders] to perform in strict compliance with [their] Technical Proposal [t]hereunder" should any of their bids have been selected as acceptable.

Plaintiff has proffered additional uncontroverted evidence that throughout the 18-month period of the solicitation, the GPO expressed an unmistakable intent to award a contract if a private bid was found acceptable. See Plaintiff's October 31, 1983

---

10. This conclusion follows from FPR § 1–1.004, 41 C.F.R. § 1–1.004, which states that the FPR shall "apply to all Federal agencies to the extent specified in the Federal Property and Administrative Services Act of 1949," ( [Pub.L. 81–152, 63 Stat. 377,] 40 U.S.C. § 471 et seq.) or in other law." Section 302 of that Act, codified at 41 U.S.C. § 252(a), states that Title III of the Act, which governs procurement procedures, shall apply to purchases and contracts by the General Services Administration and other non-military *executive agencies.* The Act's provisions therefore do not apply to legislative agencies such as the GPO (see *infra* ). The apparent lack of any other law that delineates the applicability of the FPR to the GPO (44 U.S.C. § 502, suggested by plaintiff, is inapposite) compels a finding by this court that the GPO is not bound by the FPR.

Opposition Memorandum, Attachment B; Tr. 303; Plaintiff's Exhibit 20. Moreover, the fact that the GPO hastily "cancelled" its solicitation on October 3, 1983 indicates that the agency did not consider its solicitation to be merely a request for information, for which no cancellation would have been necessary.

The language of the GPO's February 24, 1982 letter of transmittal, quoted on page 3 *supra,* might be tortuously read to indicate that the solicitation in Program 114–S was not an IFB, and therefore not subject to the provisions of GPO Printing Procurement Regulation § IV.2. Nevertheless, such a hospitable reading of same will not give defendant comfort in view of the fact that under the maxim *contra proferentum,* ambiguities in contracts should be construed against the maker of the contract, particularly where, as here, a contrary reading would conflict with the policy of the government procurement system as expressed in *Massman, supra,* as well as the subsequent actions of the parties. The court therefore holds that the GPO's solicitation under Program 114–S was an IFB subject to the "compelling reason" requirement of GPO Printing Procurement Regulation § IV.2.

## III. *The Challenge To The GPO's Determination*

Defendant next contends that if a "compelling reason" is obligatory as a basis for rejecting all bids, its compelling reason is established by the cost savings of $242,506 per year, or $1,212,530 over the five-year life of the contract, that would be realized by the cancellation.[11] Plaintiff claims that said determination was arbitrary, capricious, and without a rational basis. An important but not exclusive ground for this challenge proffered by plaintiff is that the GPO did not comply with the provisions of OMB Circular A–76, which it claims the agency was bound to follow, either because it was directly applicable to the GPO or because said provisions were a part of the implied contract. Defendant vociferously objects to review by this court of the question whether the agency complied with the provisions of the OMB Circular.[12]

In opposition to defendant's motion, plaintiff has alleged, pursuant to RUSCC 56(e), a number of specific facts which forcefully bring into dispute defendant's cost estimate. *See* Plaintiff's October 31 memorandum at 15–17. We note that defendant does not object to plaintiff's right to challenge its alleged $1.2 million savings if OMB Circular A–76 were not at issue in this case in any regard. In view thereof, the court must hold that a genuine issue of material fact exists with respect to the accuracy of the GPO's estimate that a $1.2 million cost savings would be effected by cancelling its solicitation.

In its insistence on its entitlement to summary judgment, defendant's specific claims, with respect to the GPO's determinations under OMB Circular A–76, are premised on the following arguments:

a) The GPO is not bound by the provisions of A–76, and even if it is so bound, all agency decisions pursuant to A–76 are committed by law to agency discretion;

b) Plaintiff lacks standing to assert any violations of A–76 by the GPO;

---

11. The GPO used as a basis for cost comparison with private bidders the bids of Jeffries Banknote Co. on Lots I and II, and the bids of the government on Lots III and IV, which in its view comprised in the aggregate the "otherwise successful low bid." See Plaintiff's Exhibit 53.

12. OMB Circular A–76 was originally promulgated in 1966, pursuant to statutes directing OMB to supervise expenditures by executive agencies. The Circular "establishes the policies and procedures used to determine whether needed commercial or industrial type work should be done by contract with private sources or in-house using Government facilities and personnel." *See* OMB Circular No. A–76, 44 Fed.Reg. 20,556 (1979), ¶ 1; 5 U.S.C. § 305 (1979); 41 U.S.C. § 401 et seq. (1979). The Circular was revised numerous times in intervening years, most notably in 1979 when a detailed Cost Comparison Handbook was added. The most recent revision in August 1983 did not change the 1979 version in any material respect pertinent to defendant's summary judgment motion.

c) The provisions of A–76 are in no way incorporated into the terms of the solicitation under Program 114–S; and

d) Even if A–76 is somehow incorporated into the solicitation, all of its provisions should be given effect, including the paragraph stating that the Circular shall not be the basis for a private right of action against an agency.

■ The court agrees with defendant's first contention, that the GPO is not legally bound to follow A–76 *per se.* This conclusion follows because the GPO appears to be a unit of the legislative branch, not subject to the dictates of the Circular, which applies only to "Executive Departments and Establishments." In fact, the GPO has functioned in practice under the direct supervision of Congress's Joint Committee on Printing. Discussion of the GPO's role in government, both in Congress and by GPO officials themselves, has consistently indicated that "the Joint Committee on Printing ... constitute[s], in fact, a board of directors" for the GPO, and that the GPO "is, and was, designed to be primarily under the control of Congress." 48 Cong.Rec. 3192, 3193 (1912) (remarks of Senator Smoot); *see* H.R.Rep. No. 1, 68th Cong., 1st Sess. 23 (1924); *quoted in* 41 Op.Atty.Gen. 282, 286 (1956); Government Printing Office, *100 GPO Years, 1861–1961* 163 (1961) (remarks by Public Printer Carter in 1928 Congressional testimony). Hence, recent court and General Accounting Office (GAO) decisions that have discussed the role of the GPO have considered it to be a legislative agency. *McKenzie v. Sawyer,* 684 F.2d 62, 68 (D.C.Cir.1982); *Thompson v. Sawyer,* 678 F.2d 257, 264 (D.C.Cir.1982); *Photo Data, Inc.,* B–208272, March 22, 1983, 83–1 CPD ¶ 281 (OMB Circular A–76 inapplicable to GPO because it is a legislative agency); *see also United States v. Allison,* 91 U.S. 303, 307, 23 L.Ed. 372 (1875).

Whatever lingering doubt might exist as to the general status of the GPO,[13] it is clear beyond cavil that the GPO acts as a legislative agency in its procurement decisions for printing, binding, and blank-book work. *See* 44 U.S.C. §§ 502, 504 (1979).

From the foregoing, it is apparent that the Government Printing Office is not legally bound to comply, *per se,* with OMB Circular A–76. Consequently, the argument raised by defendant, that decisions made by the GPO pursuant to A–76 are committed to agency discretion by law, is merely a response to a hypothetical question that this court need not address. Because A–76 does not, *per se,* apply to the GPO, there is also no need to address the question raised by defendant of whether plaintiff has standing as a party falling within the "zone ·of interests" of A–76.

■ Plaintiff has not simply claimed that the GPO has violated the provisions of A–76. Rather, it has made a prima facie showing, as a disappointed bidder, that the GPO has breached its implied contract to consider all bids fairly and honestly. Under the Federal Circuit and Court of Claims decisions in *Grimberg* and *Keco,* respectively, plaintiff undeniably has standing to raise such a claim.

■ The question that this court must address in preaward contract claims such as plaintiff's is whether the contracting officer's application of statutes, regulations, and *the terms of the procurement* had a rational basis. *Essex Electro Engineers, Inc.,* 3 Cl.Ct. at 281 n. 3; *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir. 1971). The parties vigorously contest whether the provisions of OMB Circular A–76 constitute material terms of subject procurement. Plaintiff argues, in this connection, that the Circular should be fully incorporated into the procurement, primarily because of the statement in the GPO's letter of transmittal that the "cost/feasibility analysis" would be conducted "as outlined in OMB Circular A–76." Conversely, defendant argues that the Circular was not at all incorporated into the procurement, primarily because of the statement made in the pre-proposal conference by a GPO official that the agency "is not bound by OMB

---

**13.** See 44 U.S.C. §§ 102, 301 (1979).

Circular A–76 but adopts its theory in principle." At a minimum, defendant asserts that the above two statements, when examined together, indicate an ambiguity in the terms of the solicitation which should be interpreted in the government's favor, because plaintiff never sought clarification of this "ambiguity" and has not demonstrated sufficient reliance on its interpretation.

The court sees little, if any, ambiguity in the meaning of these two statements, however, especially when they are considered in conjunction with the purpose of the solicitation, as elicited by the affidavits and admissions of GPO officers on the record. It is clear that the purpose of the solicitation under Program 114–S was to determine whether a private bidder was able to produce the Commerce Business Daily cheaper and more efficiently than the GPO. In making this determination, the Commerce Department insisted to the GPO that the agency should utilize a methodology that would "compare apples with apples." The solicitation and accompanying affidavits show only one methodology that the GPO chose to utilize—the agency would apply the comparative cost principles of OMB Circular A–76.

██ Indeed, all pertinent statements by GPO officials during and after the initial solicitation, including their testimony in the October 7, 1983 hearing, indicate that while the agency did not consider itself to be strictly bound by OMB Circular A–76, it committed itself to apply the cost-comparison principles contained therein for the purpose of determining whether to out-source the CBD. In view of the GPO's various *ante litem motam* concessions and the maxim *contra proferentum,* this court therefore holds that those principles of OMB Circular

A–76 that pertain specifically to cost comparisons were incorporated by reference into the solicitation under Program 114–S. Therefore, as a matter of law, such principles became terms of the implied contract of fairness running between the government and all bidders. This holding does not· mean that the government will be considered to have incorporated the "four corners" of OMB Circular A–76 into the solicitation. Instead, it shall simply mean that if the GPO in fact deviated from the fundamental cost-comparison principles of A–76 in such a way as to afford no rational basis for its determination of cost savings (thus violating the implied contract of fairness), this court can find that a "compelling reason" for the cancellation on October 3, 1983 did not exist and permanently enjoin same.

Defendant's contention appears to suggest that in no instance can a court inquire into whether an agency's actions are consistent with OMB Circular A–76. The government cites for this proposition a number of cases which it claims to have unanimously held that agency decisions under A–76 are internal managerial decisions to continue in-house production that are not subject to judicial review. *See AFGE, Local 2017 v. Brown,* 680 F.2d 722 (11th Cir.1982); *Local 2855, AFGE v. United States,* 602 F.2d 574 (3d Cir.1979); *AFGE v. Hoffmann,* 427 F.Supp. 1048 (N.D.Ala. 1976); *AFGE, Local 1872 v. Stetson,* 86 Lab.Cas. (CCH) ¶ 33,819 (D.D.C.1979). None of these cases, however, involved a claim by a disappointed bidder, as here, that the terms of A–76 were incorporated by reference into the implied contract of a particular procurement.[14]

To the contrary, subject case is analogous to a number of recent GAO decisions that

---

14. Defendant also argues that the court should follow this line of cases because agency decisions under A–76 involved "questions of judgment requiring close analysis and nice choices." *Local 2855 v. Brown,* 602 F.2d at 580–81; *quoting Panama Canal Co. v. Grace Line,* 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1958). The *Brown* court relied upon the 1967 version of A–76, however, which contained a provision stating that "[n]o specific standard or guideline is prescribed for deciding whether savings are sufficient to justify continuation of an existing Government commercial activity and each activity should be evaluated on the basis of the applicable circumstances." OMB Circular No. A–76, ¶ 7c(3) (Revised August 30, 1967); quoted in *Local 2855 v. Brown,* 602 F.2d at 581. The vitality of this aspect of *Brown* has been diminished by the deletion of the foregoing portion of the Circular in 1979 and its replacement in 1979 with the specific and detailed Cost Comparison Handbook.

have sustained bid protests under A–76. In one such case, it is worthy to note that the Comptroller General stated:

> We generally do not review an agency decision to perform work in-house rather than to contract out for the services because we regard the decisions as a matter of policy within the province of the executive branch. *Crown Laundry and Dry Cleaners, Inc.,* B–194505, July 18, 1979, 79–2 CPD 38. Where an agency, however, utilizes the procurement system to aid its decision, specifying the circumstances under which a contract will or will not be awarded, *we will review an allegation that the agency did not follow established cost comparison procedures, since a faulty or misleading cost comparison which would materially affect the decision whether or not to contract out would be abusive of the procurement system. MAR, Incorporated,* B–205635, September 27, 1982, 82–2 CPD 278. (Emphasis added.)

*Holmes & Narver Services, Inc.,* B–212191, November 17, 1983; *see Joule Maintenance Corporation,* B–208664, September 16, 1983, 83–2 CPD ¶333; *Serv-Air, Inc.,* 60 Comp. Gen. 44 (1980).

Mindful of the fact that this court is not bound by the views of the Comptroller General, nor do they operate as a judicial determination of the parties, *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 63, 617 F.2d 590 (1980), we adopt the reasoning of these GAO decisions. We note that incorporation of the cost comparison principles of OMB Circular A–76 here in the implied contract, as apparently intended, *ab initio,* is the only pragmatic means of determining whether the GPO has lived up to its implied contractual obligation to treat all bidders honestly and fairly under the terms of its solicitation.

▮ Finally, defendant has argued that if the principles of A–76 are incorporated into the solicitation, then the following section thereof should also become operative so as to preclude the possibility of judicial review:

> This Circular provides administrative direction to heads of agencies and does not establish, and shall not be construed to create, any substantive or procedural basis for any person to challenge any agency action or inaction on the basis that such action was not in accordance with this Circular, except as specifically set forth in Section 11 below.[15]

OMB Circular No. A–76, ¶3. This section offers defendant scant comfort. The GPO has repeatedly acknowledged that it did not bind itself to all of OMB Circular A–76, but only to the thrust of the operative comparative cost provisions. It has long been settled that "a reference by the contracting parties to an extraneous writing for a particular purpose makes it part of the agreement only for the purpose specified." *Guerini Stone Co. v. Carlin,* 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916); *Lodges 743 and 746, IAM v. United Aircraft,* 534 F.2d 422, 441 (2d Cir.1975). The jurisdictional sections of the OMB Circular such as those quoted above shall therefore be deemed not to have been incorporated into the solicitation.

## CONCLUSION

Plaintiff has set forth sufficient creditable facts to convince this court that there exists a genuine issue of material fact as to the efficacy of defendant's alleged $1.2 million cost savings. Defendant's motions for summary judgment and its motion to dismiss in part shall, for the foregoing reasons, be denied. In the trial on the merits, plaintiff shall have the opportunity, consistent with this opinion, to demonstrate, if it can, that the GPO's decision to cancel the solicitation under Program 114–S had no rational basis and that the agency deviated materially from the cost comparison principles of OMB Circular A–76. The court would like to reiterate that the "clear and convincing evidence" standard of proof enunciated in *Baird v. United States,* 1 Cl.Ct. 662, 664

---

**15.** Section 11 of the Circular allows for an appeal process only within the agency, stating,

"This procedure does not authorize an appeal outside the agency or judicial review."

(1983), is the linchpin to any injunctive relief on the merits.

Finally, since this is an action for equitable relief which should, to the extent appropriate, be given priority, the parties are directed to appear in this court for a preliminary pretrial conference on January 6, 1984, at 10:30 a.m.

IT IS SO ORDERED.

### ATTACHMENT A

| Bid Lots | Jeffries' Bids | |
| --- | --- | --- |
| | Individual Lots | Aggregate |
| 1 | $ 300,600 | $ 465,532 |
| 2 | 614,895 | 242,988 |
| 3 | 2,954,647 | 2,900,170 |
| 4 | 22,680 | 7,560 |
| | $3,892,822 | $3,616,249 |

| Bid Lots | GPO's Bids | |
| --- | --- | --- |
| | Individual Lots | Aggregate |
| 1 | $ 300,600* | $ 300,600* |
| 2 | 614,895* | 614,895* |
| 3 | 2,266,800 (#3) | 2,078,260 (#4) |
| 4 | 266,263 (#3) | 266,263 (#4) |
| | $3,448,558 | $3,260,018 |

* GPO did not submit a bid on Lots #1 and #2; instead, it simply "adopted" the lowest commercial bid (Jeffries) on said lots.