# Involvement of the Government Printing Office in Executive Branch Printing and Duplicating

Section 207(a) of the Legislative Branch Appropriations Act, 1993, as amended, which requires all executive branch printing to be procured by or through the Government Printing Office, vests executive functions in an entity subject to congressional control and is therefore unconstitutional under the doctrine of separation of powers.

Agency contracting officers who act consistently with this opinion, and in derogation of the contrary view of the Comptroller General, would face little or no risk of civil, criminal, or administrative liability.

May 31, 1996

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
GENERAL SERVICES ADMINISTRATION

You have asked us to analyze the constitutional implications of the involvement of the Government Printing Office ("GPO") in executive branch printing and duplicating under the authority of section 207(a) of the Legislative Branch Appropriations Act, 1993, Pub. L. No. 102–392, 106 Stat. 1703, 1719 (1992) (codified at 44 U.S.C. § 501 note) ("1993 Act"), which was recently amended by section 207(2) of the Legislative Branch Appropriations Act, 1995, Pub. L. No. 103–283, 108 Stat. 1423, 1440 (1994) ("1995 Act").[1] You have also posed a more general question as to "whether GPO may undertake any decision-making role in printing for the Executive Branch." While we have previously expressed our tentative view that such legislative branch involvement in executive branch affairs would contravene separation of powers principles,[2] we now face the issue in the context of a specific congressional enactment investing in the GPO the authority to control a significant proportion of executive branch printing and duplicating. See 44 U.S.C. § 501 note. We find that the GPO is subject to congressional control, and conclude that the GPO's extensive control over executive branch printing is unconstitutional under the doctrine of separation of powers. Finally, we make various observations about potential liability of contracting officers who act consistently with this opinion but contrary to the Comptroller General's view, which we reject.

---

[1] Letter for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Emily C. Hewitt, General Counsel, General Services Administration (Aug. 23, 1994).

[2] See, e.g., Memorandum for Sheila F. Anthony, Assistant Attorney General, Office of Legislative Affairs, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, Re: Government Printing Provisions in H.R. 3400 and S. 1824 (Apr. 1, 1994) (separation of powers violation would occur if Public Printer received power to control printing and duplicating operations in executive and judicial branches).

I

In the early years of the Republic, Congress endeavored to devise a satisfactory contract-based system for printing its official documents. In 1846, for example, Congress established an orderly contract process "for supplying the Senate and House of Representatives . . . with the necessary printing for each[.]" J. Res. of Aug. 3, 1846, § 1, 29th Cong., 9 Stat. 113, 113. Printing projects "of the respective houses" were divided into classes for which the Secretary of the Senate and the Clerk of the House of Representatives accepted sealed bids. *Id.* The 29th Congress further established a committee on printing "consisting of three members of the Senate and three members of the House." *Id.* § 2, 9 Stat. at 114. The committee on printing was entrusted with "[the] power to adopt such measures as may be deemed necessary to remedy any neglect or delay on the part of the [chosen low-bid] contractor to execute the work ordered by Congress, and to make a *pro rata* reduction in the compensation allowed, or to refuse the work altogether, should it be inferior to the standard[.]" *Id.*

The contract system devised in 1846 apparently proved unsatisfactory. The 32d Congress revisited the subject of public printing only six years later and added structure and oversight to the basic framework established in 1846. *See* Act of Aug. 26, 1852, ch. 91, 32d Cong., 10 Stat. 30. The 32d Congress created the position of "superintendent of the public printing," set qualification requirements for the position,[3] and directed the superintendent of the public printing to serve as a clearinghouse for the printing projects of the Congress and the departments and bureaus of the executive branch. *Id.* § 3, 10 Stat. at 31. Congress chose to retain the contract-based approach to printing, however, and assigned to the superintendent of the public printing the tasks of soliciting bids for public printing work and delivering the materials submitted by Congress and the executive branch "to the public printer or printers in the order in which it shall be received, unless otherwise ordered by the joint committee on printing." *Id.* §§ 3–4, 10 Stat. at 31.

The 32d Congress also provided for the election of "a public printer for each House of Congress, to do the public printing for the Congress for which he or they may be chosen, and such printing for the executive departments and bureaus of the government of the United States as may be delivered to him or them to be printed, by the superintendent of the public printing." *Id.* § 8, 10 Stat. at 32. Congressional dissatisfaction with the slow pace of public printing was manifest. The 32d Congress set a 30-day deadline for each public printing project, *id.* § 5, and expressly stated that "the public printer or printers may be required by the superintendent [of the public printing] to work at night as well as through the

---

[3] Congress explained that the "superintendent shall be a practical printer, versed in the various branches of the arts of printing and book-binding, and he shall not be interested directly or indirectly in any contract for printing for Congress or for any department or bureau of the government of the United States." Act of Aug. 26, 1852, § 2, 10 Stat. at 31.

day upon the public printing, during the session of Congress, when the exigencies of the public service require it." *Id.* § 10, 10 Stat. at 34. Finally, the 32d Congress created the Joint Committee on the Public Printing to resolve disputes "between the superintendent of the public printing and the public printer," *id.* § 12, 10 Stat. at 34, and "to adopt such measures as may be deemed necessary to remedy any neglect or delay in the execution of the public printing" of the Congress. *Id.* § 12.

In 1860, Congress completely overhauled the public printing system. J. Res. of June 23, 1860, 36th Cong., 12 Stat. 117. The 36th Congress "authorized and directed" the superintendent of public printing "to have executed the printing and binding authorized by the Senate and House of Representatives, the executive and judicial departments, and the Court of Claims." *Id.* § 1, 12 Stat. at 117. More importantly, the 36th Congress completely abandoned the contract printing system by creating the GPO.[4] Specifically, the 36th Congress granted the superintendent of public printing sweeping authority to contract for "the necessary buildings, machinery, and materials" and to hire all "hands necessary to execute the orders of Congress and of the executive and judicial departments, at the city of Washington." *Id.* §§ 1–2; *see also United States v. Allison*, 91 U.S. 303, 304 (1875) ("This resolution dispensed with the public printers appointed by the two Houses of Congress, and placed the whole subject of public printing in charge of the superintendent."). At that point in time, the GPO was simply conceptualized as a more expeditious and less partisan alternative to the existing contract system of public printing. *See Applicability of Post-Employment Restrictions on Dealing with Government to Former Employees of the Government Printing Office*, 9 Op. O.L.C. 55, 56–57 (1985).

The 39th Congress tightened the legislative branch's control over the GPO by creating the office of "Congressional printer" and abolishing the position of superintendent of public printing. Act of Feb. 22, 1867, ch. 59, §§ 1–3, 14 Stat. 398–99. *See also Allison*, 91 U.S. at 306 (Congressional Printer "was given the same powers as the superintendent of public printing"). Under the terms of the 1867 enactment, the Senate was empowered to "elect some competent person, who shall be a practical printer, to take charge of and manage the government printing office." Act of Feb. 22, 1867, § 1, 14 Stat. at 398. The Congressional Printer was "deemed an officer of the Senate," *id.* § 2, and was directed to "superintend the execution of all the printing and binding for the respective departments of the government *now required by law to be executed at the government printing office*." *Id.* (emphasis added). Thus, the 39th Congress not only declared that the head of the GPO was its own officer, but also set forth its assumption that the executive branch was obligated to submit printing and binding projects to the GPO.

---

[4] Congress chose to retain the contract system for obtaining "all paper which may be necessary for the execution of the public printing[.]" J. Res. of June 23, 1860, § 7, 12 Stat. at 118.

In 1895, Congress consolidated the GPO's control over public printing but changed the method for selecting the head of the GPO. Act of Jan. 12, 1895, ch. 23, 53d Cong., 28 Stat. 601 ("1895 Act"). In section 17 of the 1895 Act, Congress created the position of Public Printer and prescribed an appointment process modeled after the Appointments Clause, U.S. Const. art. II, §2, cl. 2: "The President of the United States shall nominate and, by and with the advice and consent of the Senate, appoint a suitable person, who must be a practical printer and versed in the art of bookbinding, to take charge of and manage the Government Printing Office." 1895 Act, §17, 28 Stat. at 603.[5]

The 1895 Act extended the exclusive domain of the Public Printer to virtually all printing operations throughout the entire federal government. Specifically, section 87 of the 1895 Act decreed that "[a]ll printing, binding, and blank books for the Senate or House of Representatives and for the Executive and Judicial Departments shall be done at the Government Printing Office, except in cases otherwise provided by law." *Id.* §87, 28 Stat. at 622. Additionally, section 31 of the 1895 Act dictated that "all printing offices in the Departments now in operation, or hereafter put in operation, by law, shall be considered a part of the Government Printing Office, and shall be under the control of the Public Printer[.]" *Id.* §31, 28 Stat. at 605. Finally, section 31 stated that "all persons employed in said printing offices and binderies [in the Departments] shall be appointed by the Public Printer, and be carried on his pay roll the same as employees in the main office, and shall be responsible to him[.]" *Id.* Thus, in the 1895 Act, Congress took the position that the GPO controlled virtually all printing and binding work in all three branches of the federal government.

The 65th Congress used an appropriations bill passed in 1919 to make explicit what had been implicit in prior public printing legislation: the GPO was subordinated to the Joint Committee on Printing, which effectively controlled the allocation of the printing and binding work of the executive and judicial branches. *See* Act of Mar. 1, 1919, Pub. L. No. 65–314, §11, 40 Stat. 1213, 1270 ("1919 Act"). Section 11 of the 1919 Act granted to the Joint Committee on Printing the "power to adopt and employ such measures as, in its discretion, may be deemed necessary to remedy any neglect, delay, duplication, or waste in the public printing and binding and the distribution of Government publications[.]" *Id.* Moreover, the 1919 Act mandated that "on and after July 1, 1919, all printing, binding, and blank-book work for Congress, the Executive Office, the judiciary, and every executive department, independent office, and establishment of the Government, shall be done at the Government Printing Office[.]" *Id.* The 65th Congress provided for only one exception to the rigid rule that all printing must be performed by the GPO: "such classes of work as shall be deemed by the Joint Committee on Printing to be urgent or necessary to have done elsewhere than in the District

---

[5] *Cf.* U.S. Const. art. II, §2, cl. 2 (President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" Officers of the United States).

of Columbia for the exclusive use of any field service outside of said District."
*Id.*

One year after Congress passed the 1919 Act, President Wilson took action to curtail the expanding role of the Joint Committee on Printing. "On May 13, 1920, President Wilson vetoed an appropriation Act on the ground that it contained a proviso that certain documents should not be printed by any executive branch or officer except with the approval of the Joint Committee on Printing." *Constitutionality of Proposed Legislation Affecting Tax Refunds,* 37 Op. Att'y Gen. 56, 62 (1933) (*"Legislation Affecting Tax Refunds"*). In explaining his decision to veto the bill, President Wilson offered the following comments:

> I regard the provision in question as an invasion of the province of the Executive and calculated to result in unwarranted interference in the processes of good government, producing confusion, irritation, and distrust. The proposal assumes significance as an outstanding illustration of a growing tendency which I am sure is not fully realized by the Congress itself and certainly not by the people of the country.

*Id.* at 62–63 (quoting veto message of President Wilson). Thus, despite initial executive branch acquiescence in the involvement of the GPO in the printing work of executive departments and bureaus, the executive branch promptly objected to the explicit insertion of the Joint Committee on Printing into executive functions.

In 1949, Congress reaffirmed that "all printing, binding, and blank-book work" for the executive and judicial branches had to be done at the GPO unless the Joint Committee on Printing authorized some other arrangement. Act of July 5, 1949, Pub. L. No. 81–156, 63 Stat. 405, 406. The 81st Congress, however, expressly exempted the Supreme Court of the United States from this requirement,[6] *id.,* thereby effectively minimizing the influence of the legislative branch with respect to judicial branch printing. The 81st Congress offered no justification for treating the printing projects of the executive and judicial branches differently, but did indicate generally that the legislation was intended "to modify the law in order to permit essential Government printing to be produced in the best interest of the Government." H.R. Rep. No. 81–841, at 1 (1949), *reprinted in* 1949 U.S. Code Cong. Serv. 1515, 1515. Although the 81st Congress conceded "that obvious savings of time and expense can be effected by producing much printing within the area where use is required," approval of such action by the Joint Committee on Printing remained a prerequisite for all executive branch printing "within the area where use is required." *Id.*

---

[6] The printing of the Supreme Court traditionally had been treated in a different manner than executive and legislative branch printing. *See Supreme Court Expenses,* 8 Op. Att'y Gen. 219, 222 (1856).

The modern legislative scheme governing public printing was enacted in 1968 by the 90th Congress, which produced an act collecting all of the public printing provisions in title 44 of the United States Code.[7] *See* Act of Oct. 22, 1968, Pub. L. No. 90–620, 82 Stat. 1238 ("1968 Act"). The 1968 Act purported "to restate in comprehensive form, without substantive change, the statutes in effect on January 14, 1968, relating to public printing and documents[.]" S. Rep. No. 90–1621, at 1 (1968), *reprinted in* 1968 U.S.C.C.A.N. at 4438–39. Therefore, the initial version of title 44 contained the requirement that "[a]ll printing, binding, and blank-book work for Congress, the Executive Office, the Judiciary, other than the Supreme Court of the United States, and every executive department, independent office and establishment of the Government, shall be done at the Government Printing Office[.]" 1968 Act, § 501, 82 Stat. at 1243. Likewise, the two exceptions to this rule remained in place: (1) "classes of work the Joint Committee on Printing considers to be urgent or necessary to have done elsewhere"; and (2) "printing in field printing plants operated by an executive department, independent office or establishment, and the procurement of printing by an executive department, independent office or establishment from allotments for contract field printing, if approved by the Joint Committee on Printing." *Id.* In other words, all executive branch printing had to be performed at the GPO unless the Joint Committee on Printing authorized some other arrangement.

Once Congress collected and codified all of the public printing provisions in title 44, few changes in the statutory scheme took place for several decades. In 1990, however, the 101st Congress reinforced the GPO's monopoly on executive branch printing with a public printing provision inserted in the Legislative Branch Appropriations Act, 1991, Pub. L. No. 101–520, 104 Stat. 2254 (1990) ("1991 Act"). Section 206 of the 1991 Act foreclosed the use of federal funds in most instances to procure printing from any commercial source unless the GPO was involved in the transaction. *Id.* § 206, 104 Stat. at 2274. The "printing" subject to this restriction included "the process of composition, platemaking, presswork, binding, and microform, and the end items of such processes." *Id.* § 206(c).

Two years later, the 102d Congress used another legislative branch appropriations act to broaden the language of the provision prohibiting public printing by commercial sources without the involvement of the GPO. *See* Legislative Branch Appropriations Act, 1993, Pub. L. No. 102–392, § 207, 106 Stat. 1703, 1719–20 (1992) ("1993 Act"). The 1993 Act expanded the proscription to include the expenditure of any funds appropriated in any fiscal year for any printing from any source other than the GPO. *Id.* § 207(a)(1), 106 Stat. at 1719. The 1993 Act also added "silk screen processes" to the definition of "printing," *id.* § 207(a)(3), 106 Stat. at 1720, thereby enlarging the scope of the GPO's exclusive domain.

---

[7] The public printing initiative resulted from congressional concern that "many laws ha[d] been enacted" affecting the printing scheme set forth in the 1895 Act, but these laws had not uniformly amended the 1895 Act, "with the result that the body of printing laws ha[d] grown haphazardly." S. Rep. No. 90–1621, at 1 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4438, 4439.

Congress's effort to accord the GPO control over executive branch printing reached its zenith in 1994 with the passage of the Legislative Branch Appropriations Act, 1995, Pub. L. No. 103–283, 108 Stat. 1423 (1994) ("1995 Act"). Section 207(2) of the 1995 Act expanded the definition of "printing" subject to GPO control to include "duplicating." *Id.* § 207(2), 108 Stat. at 1440. Thus, the principal statutory provision restricting executive branch printing,[8] which is codified at 44 U.S.C. § 501 note currently reads as follows:

> (1) None of the funds appropriated for any fiscal year may be obligated or expended by any entity of the executive branch for the procurement of any printing related to the production of Government publications (including printed forms), unless such procurement is by or through the Government Printing Office.

> (2) Paragraph (1) does not apply to (A) individual printing orders costing not more than $1,000, if the work is not of a continuing or repetitive nature, and, as certified by the Public Printer, if the work is included in a class of work which cannot be provided more economically through the Government Printing Office, (B) printing for the Central Intelligence Agency, the Defense Intelligence Agency, or the National Security Agency, or (C) printing from other sources that is specifically authorized by law.

> (3) As used in this section, the term "printing" includes the processes of composition, platemaking, presswork, duplicating, silk screen processes, binding, microform, and the end items of such processes.

Although President Clinton approved the 1995 Act, he issued a signing statement that expressed serious concerns about the ever-increasing "involvement of the Public Printer and the Government Printing Office in executive branch printing related to the production of Government publications." Statement by President William J. Clinton Upon Signing the Legislative Branch Appropriations Act of 1995, H.R. 4454, 1 Pub. Papers of William J. Clinton 1301, 1301 (July 22, 1994). Specifically, the President's statement framed the constitutional issues this way:

> The Act raises serious constitutional concerns by requiring that executive branch agencies receive a certification from the Public Printer before procuring the production of certain Government doc-

---

[8] Chapter 11 of title 44, United States Code, contains a host of statutory provisions dealing with the general subject of executive and judicial branch printing. *See* 44 U.S.C. §§ 1101–1123. Those statutes, however, focus primarily upon the logistical concerns of the Public Printer in responding to printing orders from the executive and judicial branches.

> uments outside of the Government Printing Office. In addition, the Act expands the types of material that are to be produced by the Government Printing Office beyond that commonly recognized as "printing."

*Id.* To ameliorate the perceived constitutional defects in 44 U.S.C. § 501 note, the President chose to interpret the amendments to the public printing provision narrowly. *See, e.g., Communications Workers v. Beck*, 487 U.S. 735, 762 (1988) ("federal statutes are to be construed so as to avoid serious doubts as to their constitutionality"). First, the President expressed his intention to restrict "the exclusive authority of the Government Printing Office" over executive branch printing "to procurement of documents intended primarily for distribution to and use by the general public." Statement by President William J. Clinton, 1 Pub. Papers of William J. Clinton at 1301. Second, the President interpreted the concept of "duplicating" to "encompass only the reproduction inherent in traditional printing processes, such as composition and presswork, and not reproduced by other means, such as laser printers or photocopying machines." *Id.*

The legislative branch did not accept President Clinton's narrowing construction of 44 U.S.C. § 501 note. In response to an inquiry from Senator Wendell H. Ford, the Chairman of the Joint Committee on Printing, the Comptroller General issued an opinion concluding that, in virtually all instances, "executive agencies procuring duplicating services involving the use of high-speed duplicating equipment must do so through the GPO[.]" B–251481.4, 1994 WL 612291, at *3 (C.G. Sept. 30, 1994). Thus, the interpretations of 44 U.S.C. § 501 note espoused by the executive branch and the legislative branch are in direct conflict. Faced with these divergent views, you asked us for "an interpretation of the proper construction of title 44 of the U.S. Code." We conclude that, to the extent that 44 U.S.C. §§ 501 & 501 note require all executive branch printing and duplicating to be procured by or through the GPO, those statutes violate constitutional principles of separation of powers and that executive branch departments and agencies are not obligated to procure printing by or through the GPO.

## II

The constitutional doctrine of separation of powers prohibits Congress from performing functions that are not legislative or in aid of the legislative process. Except through the passage of legislation, Congress may not seek to control the performance of functions that are "beyond the legislative sphere." *See Bowsher v. Synar*, 478 U.S. 714, 733–34 (1986); *see also Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise*, 501 U.S. 252, 274 (1991) ("*MWAA*") (separation of powers doctrine is directed at "forestall[ing] the danger of encroachment 'beyond the legislative sphere' "); *INS v. Chadha*, 462 U.S. 919

(1983); *Hechinger v. Metropolitan Washington Airports Auth.*, 36 F.3d 97 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1126 (1995); *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993), *cert. dismissed*, 513 U.S. 88 (1994); *cf. Buckley v. Valeo*, 424 U.S. 1, 137–41 (1976) (per curiam).

In *Bowsher*, for example, the Supreme Court held that Congress violated the doctrine of separation of powers by vesting non-legislative functions in an official who was subject to Congress's control. *Bowsher* involved the Balanced Budget and Emergency Deficit Control Act of 1985. That statute established maximum federal budget deficits for each of the succeeding five years. If the projected deficit for any year exceeded the statutory maximum, the Comptroller General was to specify for the President spending reductions necessary to bring the deficit under the designated ceiling. The President was then required to issue a sequestration order effectuating the Comptroller General's cuts. 478 U.S. at 717–18. The Comptroller General is appointed by the President from a list of nominees submitted by the Congress and "is removable only at the initiative of Congress." *Id.* at 728 (Comptroller General may be removed by joint resolution of Congress finding one of five statutorily enumerated causes).

The Court characterized the Act as giving the Comptroller General executive functions, *id.* at 733, but did not hold that the Comptroller General is an agent of Congress. If it had, the Court's holding would have been the unremarkable observation that Congress may not vest itself or one of its agents with executive authority. The Act, however, did not give Congress any formal authority to vote on or dictate any particular of how the Comptroller General would exercise the executive functions that the Act conferred upon him. In other words, Congress had no formal power over the exercise of the Comptroller General's executive functions. Nevertheless, the Court viewed the removal power as giving Congress the ability to coerce the Comptroller General to conform to the "legislative will." *See id.* at 729.[9]

Thus, the constitutional doctrine of separation of powers forbids Congress from vesting non-legislative functions — specifically, in the case of your inquiry, executive functions — in the GPO if Congress retains control over the GPO. First, we will examine the extent to which Congress controls the GPO. Then, we will determine whether the functions that the GPO performs may be characterized as falling within the legislative sphere.

---

[9] The GPO argues that *Bowsher* only prohibits vesting executive functions in officials over whom Congress holds the power of removal. Letter for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Anthony J. Zagami, General Counsel, United States Government Printing Office at 1 (Sept. 22, 1994). We agree that the President may remove the public printer at will. Further, we agree that non-legislative functions may not be vested in an official who is removable by Congress. Nevertheless, we cannot read *Bowsher* as applying exclusively to those officials who are removable by Congress. The Supreme Court could not have been clearer in holding that the Constitution prohibits Congress from retaining any sort of control that allows it to exert its "legislative will" outside the legislative sphere. *See, e.g.,* 478 U.S. at 729–32 (discussing significance of Congress's view that the Comptroller General is within the legislative branch).

### A. *Congressional Control of the GPO*

One significant indication of control is whether Congress perceives an agency or official as its agent or as an entity of the legislative branch. *See Bowsher*, 478 U.S. at 731–32. The GPO, since its inception, has been conceptualized as a congressional entity.[10] *See Allison*, 91 U.S. at 307 (head of GPO "is more responsible to Congress than to any other authority"). "Discussion of the GPO's role in government, both in Congress and by GPO officials themselves, has consistently indicated that 'the Joint Committee on Printing . . . constitute[s], in fact, a board of directors' for the GPO, and that the GPO 'is, and was, designed to be primarily under the control of Congress.' " *International Graphics, Div. of Moore Business Forms, Inc. v. United States*, 4 Cl. Ct. 186, 197 (1983). Moreover, the Comptroller General has consistently concluded that the GPO "is under the legislative branch of the Government."[11] 36 Comp. Gen. 163, 165 (1956); 29 Comp. Gen. 388, 390 (1950). In addition, the Courts have taken the same view. *See, e.g., Thompson v. Sawyer*, 678 F.2d 257, 264 (D.C. Cir. 1982) (GPO "is a unit of the legislative branch"); *accord Lewis v. Sawyer*, 698 F.2d 1261, 1262 n.2 (D.C. Cir. 1983) (Wald, J., concurring) (GPO is "a legislative unit performing a support function for Congress"); *International Graphics*, 4 Cl. Ct. at 197 ("GPO appears to be a unit of the legislative branch").

The Supreme Court has also noted that an official is subservient to the branch of government that has the authority to control and supervise the conduct of that official's functions. *See Bowsher*, 478 U.S. at 730. On this score, both the Public Printer and the GPO are beholden to Congress in several significant respects. As we have previously explained:

> The Congressional Joint Committee on Printing ("JCP") retains supervisory control over a host of GPO's functions. *See, e.g.,* 44 U.S.C. § 103 (power to remedy neglect, delay, duplication, and waste); *id.* § 305 (approval of GPO employees' pay); *id.* § 309 (revolving fund available for expenses authorized in writing by the JCP); *id.* § 312 (requisitioning of materials and machinery with ap-

---

[10] Indeed, in 1867, Congress expressly declared that the GPO was to be run by the Congressional Printer, who was elected by the Senate and "deemed an officer of the Senate." Act of Feb. 22, 1867, ch. 59, §§ 1–2, 39th Cong., 14 Stat. 398–99. The major public printing reform of 1895 gave rise to the position of Public Printer and prescribed a new method for selecting this head of the GPO — nomination by the President and appointment "by and with the advice and consent of the Senate." 1895 Act, § 17, 28 Stat. at 603. This selection system, however, did not necessarily transform the Public Printer into an officer of the executive branch. *See Bowsher*, 478 U.S. at 758 n.25 (Stevens, J., concurring) (identifying Public Printer as "obvious congressional agent[]" despite appointment by President); *cf. also Mistretta v. United States*, 488 U.S. 361, 408–11 (1989) (members of Sentencing Commission in judicial branch appointed and subject to removal by President). In any event, while the 1895 modification of the appointment process may have reduced the direct control of Congress over the GPO, the 1919 Act firmly established the preeminence of the JCP — composed of members of Congress — in matters of public printing. *See* 1919 Act, § 11, 40 Stat. at 1270.

[11] In ascribing to Congress the views of the Comptroller General, we are fortified by the Supreme Court's decision in *Bowsher*, which held that Congress controls the Comptroller General. *See* 478 U.S. at 727–32.

proval of the JCP); *id.* §313 (examining board consisting of GPO personnel and a person designated by the JCP); *id.* §502 (approval of contract work); *id.* §505 (regulation of sale of duplicate plates); *id.* §§509–517 (approval of paper contracts); *id.* §1914 (approval of measures taken by the Public Printer to implement the depository library program)[.]

*Applicability of Post-Employment Restrictions on Dealing with Government to Former Employees of the Government Printing Office,* 9 Op. O.L.C. at 57 (footnote omitted). What we deduced in 1985 is equally accurate today: "This relationship to Congress appears to preclude a conclusion, either in fact or as a constitutional matter, that the GPO is not an arm of Congress." *Id.* (citation omitted).

Given the level of control over the GPO that Congress exercises today through the JCP,[12] as well as the history of the relationship between the GPO and Congress, we believe that the GPO is subject to the sort of control that Congress may not exercise over an actor that performs non-legislative functions.[13] We now turn to consider whether the GPO's functions fall outside the legislative sphere.

### B. *The Nature of GPO's Functions*

Section 501 of title 44, United States Code, establishes that "[a]ll printing, binding, and blank-book work for Congress, the Executive Office, the Judiciary, other than the Supreme Court of the United States, and every executive department, independent office and establishment of the Government, shall be done at the Government Printing Office[.]"[14] Subsection (1) of 44 U.S.C. §501 note bolsters the provision granting the GPO exclusive control of virtually all the printing work of the executive branch: "None of the funds appropriated for any fiscal year may be obligated or expended by any entity of the executive branch for the procurement of any printing related to the production of Government publications (including printed forms), unless such procurement is by or through the Government Printing Office."[15] "Printing" is defined in subsection (3) of 44 U.S.C. §501

---

[12] The JCP, which "consist[s] of the chairman and four members of the Committee on Rules and Administration of the Senate and the chairman and four members of the Committee on House Administration of the House of Representatives[,]" 44 U.S.C. § 101, is undeniably a congressional entity.

[13] We need not determine whether Congress has ever actually sought to exert the control that it, by statute, has retained. The mere existence of this ability to control the GPO raises the separation of powers bar against vesting the GPO with non-legislative functions. *See Bowsher,* 478 U.S. at 730 (dismissing as beside the point Justice White's vigorous argument that "[r]ealistic consideration of the nature of the Comptroller General's relation to Congress . . . reveals that the threat to separation of powers . . . is wholly chimerical." *Id.* at 774 (White, J., dissenting)).

[14] Section 501 contains two exceptions to this sweeping rule; both of the exceptions require the approval of the JCP. 44 U.S.C. §§501(1) & 501(2). In 1984, we declared the JCP approval provisions unconstitutional with respect to operations outside the legislative branch. Memorandum for William H. Taft, IV, Deputy Secretary of Defense, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Effect of INS v. Chadha on 44 U.S.C. §501, "Public Printing and Documents"* at 3–6 & n.5 (Mar. 2, 1984); *Constitutionality of Proposed Regulations of Joint Committee on Printing,* 8 Op. O.L.C. 42, 51 & n.14 (1984).

[15] Subsection (2) of 44 U.S.C. §501 note sets forth three exceptions to this sweeping prohibition. These exceptions include printing for the Central Intelligence Agency, the Defense Intelligence Agency, and the National Security

note to include "the processes of composition, platemaking, presswork, duplicating, silk screen processes, binding, microform, and the end items of such processes." By enacting these statutory provisions, Congress has forbidden the executive branch to expend funds on printing that is not procured by or through the GPO.

Congress may create and empower an entity such as the GPO to provide printing in aid of its legislative function. *Cf. Chadha*, 462 U.S. at 956 n.21 (recognizing authority of each House of Congress "to act alone in determining specified internal matters"). However, when Congress dictates that all executive branch printing and duplicating must be procured by or through the GPO, *see* 44 U.S.C. §§ 501 & 501 note the GPO necessarily acts outside the legislative sphere.

The GPO implicitly concedes — as it must — that its involvement in executive branch printing is beyond the legislative sphere, but asserts that such action does not violate separation of powers principles because its duties with regard to executive branch printing "are essentially ministerial and mechanical so that their performance does not constitute 'execution of the law' in a meaningful sense." *Bowsher*, 478 U.S. at 732. We doubt that the doctrine of separation of powers permits Congress to control functions outside the legislative sphere as long as such aggrandizement is in some sense *de minimis*. We need not resolve that issue here, however, because the experience of executive branch agencies under recent amendments to 44 U.S.C. § 501 note belies the GPO's characterization of its authority.

Under the current public printing regime, the GPO is obligated to "execute such printing and binding for the President as he may order and make requisition for." 44 U.S.C. § 1101. Nevertheless, the GPO controls the timing [16] and the production of all printing work for the executive branch. 44 U.S.C. §§ 501 & 501 note. The Public Printer also determines "the form and style in which the printing or binding ordered by a department is executed, and the material and the size of type used[.]" 44 U.S.C. § 1105. Moreover, any executive branch officer in possession of printing equipment "no longer required or authorized for his service" must "submit a detailed report of them to the Public Printer." 44 U.S.C. § 312. The Public Printer possesses the statutory authority to "requisition such articles," which must then "be promptly delivered" to the GPO.[17] *Id.* In sum,

---

Agency, as well as all printing for other sources that is specifically authorized by law. In addition, subsection (2) creates an exception for small printing orders. The exception for small printing orders, which requires the certification of the Public Printer, is discussed in section III(B) of this opinion.

[16] The United States Court of Appeals for the District of Columbia Circuit has held that a congressionally controlled entity may not be given authority to delay an executive function. *See Hechinger v. Metropolitan Washington Airports Auth.*, 36 F.3d 97 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1126 (1995).

[17] The GPO and JCP have used this authority to strip executive branch agencies of their ability to engage in printing and duplicating. The experience of the Department of Veterans Affairs regional office in Philadelphia, Pennsylvania is illustrative. On March 26, 1993, the JCP advised the Secretary of Veterans Affairs that the regional office "ha[d] acquired a two color printing press and [was] conducting printing activities without the concurrence of this Committee." Letter for Honorable Jesse Brown, Secretary of Veterans Affairs, from Honorable Wendell H. Ford, Chairman, Joint Committee on Printing (Mar. 26, 1993). The JCP instructed the Secretary of Veterans Affairs to "review this matter and take immediate action to transfer all printing requirements to the nearest Govern

Continued

what began as a cooperative arrangement in 1860 that was mutually beneficial to the executive and legislative branches has become a system by which Congress — acting primarily through the GPO and the JCP — maintains an ever-increasing degree of control over executive branch printing. Because the GPO is subject to congressional control and because the GPO performs executive functions, we conclude that the language in 44 U.S.C. §§ 501 & 501 note requiring the executive branch to procure all of its printing by or through the GPO is unconstitutional and, therefore, inoperative.

### C. *Certification*

You have also directed our attention to a provision of 44 U.S.C. § 501 note that you regard as inconsistent with *Chadha*. Specifically, subsection (2) of 44 U.S.C. § 501 note excludes from the class of printing work subject to GPO control "individual printing orders costing not more than $1,000, if the work is not of a continuing or repetitive nature, and, as certified by the Public Printer, if the work is included in a class of work which cannot be provided more economically through the Government Printing Office[.]" Whether this provision involving discretionary certification by the Public Printer is understood as the exercise of legislative power or executive power, it plainly runs afoul of separation of powers principles. "If the power is executive, the Constitution does not permit an agent of Congress to exercise it. If the power is legislative, Congress must exercise it in conformity with the bicameralism and presentment requirements of Art. I, § 7" of the Constitution. *MWAA*, 501 U.S. at 276. As we have previously explained in the context of a public printing dispute, any statute that permits a congressional agent "to effect an exception to a legislated rule" is unconstitutional. *See* Memorandum for William H. Taft, IV, Deputy Secretary of Defense, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Effect of INS v. Chadha on 44 U.S.C. § 501, "Public Printing and Documents"* at 5 n.5 (Mar. 2, 1984).

Although we have found a fatal constitutional defect in the statutory provision granting the Public Printer the authority to except certain small printing orders from the control of the GPO, we need not engage in a protracted discussion of

---

ment Printing Office Regional Procurement Office and comply with section 312, 44 U.S.C. for disposition of this unauthorized equipment." *Id.* Ten months later, Senator Wendell Ford wrote to the Department of Veterans Affairs in his capacity as Chairman of the JCP to express dissatisfaction with the Department's response. Senator Ford demanded executive branch compliance with the desires of the JCP:

> I ask that your Inspector General readdress these issues and that the Headquarters printing management organization be involved to facilitate the orderly transfer of work to GPO. I have asked the Public Printer to have his staff contact appropriate departmental officials to expedite this process. At your earliest convenience, please provide the Joint Committee with a listing of all printing and duplicating equipment, including its age, condition and cost, now on site at [the regional office in Philadelphia]. Please immediately remove the two color press and any similar equipment from this site in accordance with the provisions of section 312, 44 USC.

Letter for Honorable Jesse Brown, Secretary of Veterans Affairs, from Honorable Wendell H. Ford, Chairman, Joint Committee on Printing at 1 (Jan. 13, 1994).

the effect of this conclusion upon the balance of subsection (2) of 44 U.S.C. § 501 note. Subsection (2) simply creates an exception to the broad rule of 44 U.S.C. §§ 501 and 501 note, that all executive branch printing must be procured by or through the GPO. Because we have already determined that this requirement runs afoul of separation of powers principles, there is no reason to address the scope of the remaining exceptions to the general requirement.

## III

It appears that the Comptroller General does not share our view regarding the constitutionality of the GPO's control over executive branch printing. *See, e.g.,* Opinion for Senator Wendell H. Ford, Chairman of the Joint Committee on Printing, B–251481.4, 1994 WL 612291 (C.G. Sept. 30, 1994).[18] You have asked whether contracting officers who act in a manner consistent with our opinion and in derogation of the Comptroller General's view will be subject to liability or sanction.

This opinion presents the official view of the executive branch; the Comptroller General's opinion may not carry legally binding effect, although it may be considered for whatever persuasive value it may offer. *See Bowsher,* 478 U.S. at 733 (holding that statute unconstitutionally entrusted execution of laws to Comptroller General, a unit of the legislative branch, because ''[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law''); *see also Buckley,* 424 U.S. at 137–41 (holding that officials whom Congress controls cannot participate in the issuance of advisory opinions that have legally binding effect outside the legislative branch). We further note that neither the Comptroller General nor the Inspectors General may initiate prosecutions on their own. Inspector General Act of 1978, 5 U.S.C. app.; *United States v. Nixon,* 418 U.S. 683, 693 (1974). Both the Comptroller General and the Inspectors General have the statutory authority to audit and disallow costs, *see* 31 U.S.C. §§ 3522–3530; 5 U.S.C. app. § 4(a)(1), (b), but these powers cannot be stretched so as effectively to encompass prosecutorial decisions.

With respect to the Comptroller General, the Supreme Court has held that the Constitution does not permit the Comptroller General to exercise authority with respect to executive functions. *Bowsher,* 478 U.S. at 721–27. Although the Comptroller General may audit expenditures and in the course of doing so may express an opinion as to the propriety of costs incurred, the Comptroller General may not in any legally consequential sense ''disallow'' an expenditure or cost. Any statute purporting to give the Comptroller General such authority is invalid. *See, e.g., Hechinger v. Metropolitan Washington Airports Auth.,* 36 F.3d 97 (D.C. Cir.

---

[18] Separate statutory provisions vest in the Comptroller General the authority to relieve accountable officials and certifying officials of such liability. *See* 31 U.S.C. §§ 3527–3529. We have determined, however, that this grant of authority to a congressional agent violates separation of powers principles. *See Comptroller General's Authority To Relieve Disbursing and Certifying Officials From Liability,* 15 Op. O.L.C. 80 (1991).

1994), *cert. denied,* 513 U.S. 1126 (1995); *Comptroller General's Authority To Relieve Disbursing and Certifying Officials From Liability,* 15 Op. O.L.C. 80 (1991). Insofar as this position is not free of litigation risk, *see Lear Siegler, Inc., Energy Prods. Div. v. Lehman,* 842 F.2d 1102 (9th Cir. 1988), *modified as to attorney fees,* 893 F.2d 205 (9th Cir. 1989) (en banc); *Ameron Inc. v. United States Army Corps of Engineers,* 809 F.2d 979 (3d Cir. 1986), *cert. granted,* 485 U.S. 958 (1988), *cert. dismissed,* 488 U.S. 918 (1988),[19] you have asked us whether there are additional specific measures that agencies may take to safeguard contracting officers.

It appears that, except for *qui tam* suits (which are discussed below), the only entity that could bring a civil or criminal action against a certifying official in court would be the executive branch, and more specifically the Department of Justice. Any actions considered by the Department of Justice would necessarily be in accord with the constitutional views expressed by the President in his signing statement and the opinions of this Office. Consequently, we see little risk to an officer who acts consistently with our interpretation.

Administrative liability poses separate issues, but ones that we believe may be allayed by GSA itself. Congress has attempted to provide an enforcement mechanism for the Anti-Deficiency Act, 31 U.S.C. § 1341(a), and other restrictions on appropriations by holding certain executive branch employees personally liable for amounts illegally authorized or disbursed. For example, 31 U.S.C. § 3528(a) provides that a certifying official is responsible for the legality of the proposed payment on a voucher and for repaying any payments that are illegal, improper, or prohibited by law. The Comptroller General uses the GAO's audit powers to determine what amounts are wrongfully spent or unallowable, and 31 U.S.C. § 3526(a) grants the Comptroller General the power to "settle all accounts of the United States Government and supervise the recovery of all debts finally certified by the Comptroller General as due the Government."

For funds determined to be illegally expended, the government may attempt to collect that debt pursuant to the Federal Claims Collection Act of 1966. Section 3716 of title 31, United States Code, and various regulations provide for administrative offset to collect claims due the United States, following notice of the prospective offset. 4 C.F.R. pts. 101–105 (1996); 41 C.F.R. §§ 105–55.001 to 105–56.013 (1995).[20] When a current employee owes the debt, the agency may attempt to collect it through administrative offset. 41 C.F.R. § 105–56.001.

Thus, the danger for the certifying officials is that the Comptroller General will determine that a given payment is illegal and that the certifying official is adminis-

---

[19] The Department of Justice has consistently taken the position that these lower court cases were wrongly decided and are inconsistent with the Supreme Court's decision in *Bowsher.* We continue to adhere to this view and will assert this position if an appropriate case arises. *See* Brief of United States at 30–33, *Hechinger v. Metropolitan Washington Airports Auth.,* 36 F.3d 97 (D.C. Cir. 1994) ( No. 94–7036).

[20] Federal regulations authorize the GSA to collect, compromise, or terminate collection efforts on debts owed the United States arising from activities under GSA's jurisdiction. All the contracts at issue — whether GSA is paying for services, or collecting for services rendered — arise under GSA's jurisdiction. *See, e.g.,* 41 C.F.R. pt. 105–55.

tratively liable for these expenditures. The statutory structure appears to be designed to enforce collection of claims or debts owed to the United States. Section 3711(a) of title 31, United States Code, provides that the head of an executive agency *shall* try to collect a claim of the United States Government for money or property arising out of the activities of the agency.

The statute also, however, allows the agencies to compromise claims of less than $100,000, and, pursuant to the GSA's regulations, GSA may decline to collect on a claim when it determines that the claim is legally meritless. 41 C.F.R. § 105-55.008(b); *see also* 4 C.F.R. § 104.3(d) (joint DOJ and GAO regulations providing for termination of legally meritless claims).[21] GSA could thus offer reassurances to its officers and the agencies contracting with it that any debts found by the Comptroller General to be owed by GSA or other agency officers as a result of payments made on the contracts at issue would be legally without merit. GSA could further assure its employees and the employees of agencies contracting with it for routine photocopying services that it would not seek to recoup such amounts through administrative offset. Although GSA has government-wide authority to collect claims owed the United States through administrative offset, other agencies could offer reassurances to their employees that they would not seek in any way to collect as claims owed the United States amounts determined to fall outside the scope of section 207(a)(1), notwithstanding any contrary determination on the part of the Comptroller General.

Assuming that GSA did not make such a determination in advance, it still could shield executive branch employees from administrative liability on a case-by-case basis. Following a determination by the Comptroller General that a certifying officer owed a debt to the United States, the burden would be on GSA to issue the notice to the employee of the determination that part of his or her salary was to be offset. If it failed to issue the notice of debt, notwithstanding a Comptroller General directive that it do so, the Comptroller General would seem to have no recourse, other than to notify Congress of the dispute. Congress's possible actions would be general ones, against the GSA itself, and not against the particular employee.

Even if GSA did perform the offset, it would remain possible, consistent with the regulation, to relieve the contracting official of liability. GSA has the authority promptly to refund an amount already offset when a debt is waived or otherwise found not owing the United States, or when GSA is directed by an administrative or judicial order to refund amounts deducted from the employee's current pay. 41 C.F.R. § 105-56.012. The regulations do not state who may make such a finding. A finding by the Department of Justice or GSA superiors that no debt was

---

[21] The regulations also provide that waivers of liability for government employees, if authorized by law, may be requested from the General Accounting Office. 41 C.F.R. §§ 105-56.004(g), 105-56.005(b). It is unlikely, however, that GAO would authorize a waiver if it determined that payments for the copier rentals would violate section 207.

owing and that a refund should be made would relieve the officer of individual liability.

The only remaining theoretical risk of exposure would arise from *qui tam* suits under the False Claims Act, 31 U.S.C. §§ 3729–3733. Such suits would almost assuredly fail, however, because such actions should either be defeated pursuant to a motion to dismiss or on the merits. In brief, in order to state a claim under 31 U.S.C. § 3729, a plaintiff must demonstrate that someone knowingly submitted or caused to be submitted a false or fraudulent claim to the government.[22] If an official simply authorizes payment on a contract lawfully entered into, it is difficult to envision how liability could lie under the False Claims Act. Although, in some situations, False Claims Act cases may be brought against government officials in their personal capacity, the circumstances at issue here do not appear to give rise to such claims. Even if the officer is required to certify that he or she understands that the claim is being paid in accordance with law, such a certification presumably would not be determined to be a false statement, with respect either to rental contracts or photocopying contracts, given this Office's determination that payment of the contracts would be in accord with the law. The contract would have been clearly authorized at the time it was signed (pursuant to a clear executive branch interpretation of the law), the agency would have authorized all the relevant actions (including payment), and the contractor would have fulfilled its obligations under the contract. Thus, there would be no false statement and the intent element — *knowingly* submitting a false statement — would also be absent.

Even if a matter were filed against an individual certifying officer, the Department of Justice would have the authority to represent the officer. 28 C.F.R. § 50.15 (1995). The Department is authorized to undertake such representation when "the actions for which representation is requested reasonably appear to have been performed within the scope of the employee's employment and the Attorney General

---

[22] Section 3729(a) establishes liability for:

Any person who —

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

(4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

or his designee determines that providing representation would otherwise be in the interest of the United States." *Id.* at § 50.15(a). Those circumstances would seem to be present here, although the Civil Division would make the determination regarding representation, whether by the Department or by outside counsel.[23]

For the foregoing reasons, we believe that any agency officials involved in the decision to certify or disburse money pursuant to the three types of contracts discussed herein face little or no litigation risk arising from the decision to certify or disburse.

## IV

To the extent that 44 U.S.C. §§ 501 and 501 note require all executive branch printing and duplicating to be procured by or through the GPO, those statutes violate constitutional principles of separation of powers. We further find that the provision in subsection (2) of 44 U.S.C. § 501 note authorizing the Public Printer to certify exceptions to the general rule of printing by or through the GPO is unconstitutional, but we need not ascertain the implications of that determination given our conclusion that executive branch departments and agencies are not obligated to procure printing by or through the GPO. Finally, we perceive little or no risk of liability or sanction to contracting officers who act consistently with this opinion.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[23] It should also be noted that, under the False Claims Act, the United States has significant control over suits filed under that Act alleging that the contracting officer somehow submitted a false statement in order to get a claim allowed or paid. As a procedural matter, the United States has the opportunity to intervene in a False Claims Act action filed by a relator and may, following intervention, move to dismiss. If the relator objects, however, it has the opportunity to have its objections heard. 31 U.S.C. § 3730(c)(2)(A).